## A95A2292. SAXTON v. COASTAL DIALYSIS & MEDICAL CLINIC, INC.

(470 SE2d 252)

BEASLEY, Chief Judge.

1. On February 24, 1995, Coastal Dialysis & Medical Clinic, Inc. brought a complaint against Dr. Saxton to enforce a two-year non-compete covenant in the employment contract which had otherwise governed the parties' relationship until Dr. Saxton's resignation was accepted as of July 1, 1994. Coastal Dialysis sought interlocutory and permanent injunctions against breach of the covenant, damages in the alternative, and attorney fees and costs of litigation under OCGA § 13-6-11. At that time, the covenant had remaining 16 months of potential life.

The trial court held two hearings, received evidence and argument, and issued an interlocutory injunction on March 26, 1995. It ordered that the terms of the injunction were to remain in effect until further order but in no event later than June 30, 1996, when the covenant would expire. The court provided a certificate of immediate review pursuant to OCGA § 5-6-34 (b), which was filed April 3, and Dr. Saxton filed an application for interlocutory review in the Supreme Court of Georgia.[1]

By order on April 20, the Supreme Court transferred the application to this Court on the basis that "the grant of equitable relief was merely ancillary to an underlying issue of law, i.e., whether the trial court properly construed the employment agreement, [so that, in the opinion of the Supreme Court] jurisdiction is properly in the Court of Appeals." The Court cited its 1993 case of *Pittman v. Harbin Clinic &c.*, 263 Ga. 66 (428 SE2d 328) (1993). That was a different kind of action, one that is entitled to direct appeal, a declaratory judgment action brought by several doctors who sought a declaration that the restrictive covenants were unenforceable. The trial court found the covenants valid and enforceable against two doctors and invalid and unenforceable against the other two doctors. *Pittman v. Harbin Clinic &c.*, 210 Ga. App. 767 (437 SE2d 619) (1993). Direct appeals were taken by the losing parties and consolidated. Upon transfer of the appeals to this Court, it affirmed the judgment of the trial court on the merits and dismissed the cross-appeals. Id.

In this case, on April 24, immediately after the transfer of the application, Dr. Saxton filed a notice of direct appeal to this Court from the order on the interlocutory injunction, citing *Pittman*. While

---

[1] He also filed a notice of appeal to the Supreme Court pursuant to OCGA § 5-6-34 (a) (4), which allows direct appeals from the grant or denial of interlocutory or final injunctions, resorting to the application method "out of an abundance of caution" because the trial court had issued a certificate for immediate review of an interlocutory ruling.

direct appeal was awaiting preparation of the record in the court below, this Court dismissed the application for interlocutory review on May 22 on the ground that the grant or denial of an interlocutory injunction is directly reviewable under OCGA § 5-6-34 (a) (4). The court cited *Pizza Hut of America v. Kesler*, 254 Ga. 360 (1) (329 SE2d 133) (1985), in which the Supreme Court applied OCGA § 5-6-34 (a) (4) and held that the grant of even a temporary injunction is directly appealable. The Supreme Court had jurisdiction of that case because it was an "equity case," Ga. Const., Art. VI, Sec. VI, Par. III (2), and apparently, in the Supreme Court's judgment, drew into question the validity of the injunction. Actually, the issue was whether the court could at the same time find appellants in contempt and fine the corporate defendant, not whether the injunction was proper.

The aspect of Dr. Saxton's case which was directly reviewable, i.e., the grant of interlocutory injunction, was found by the Supreme Court to be "merely ancillary to an underlying issue of law, i.e., whether the trial court properly construed the employment agreement." By transferring the application to this Court, the Supreme Court eliminated from review the foundation for direct appeal status under OCGA § 5-6-34 (a) (4), that is, the injunctive nature of relief granted. It also left for this Court the question of whether an application was the proper path for appeal. This Court held that it was not, for the very same reason the Supreme Court had used in concluding that it did not have jurisdiction of the matter. Thus we have the puzzle: the action is not an equity case for the purpose of invoking appellate jurisdiction because the issue raised on appeal is a legal one. That is the Supreme Court's view, the reason given for transfer. On the other hand, the action was ruled to be an equity case for the purpose of access to appellate review by direct appeal to the Court of Appeals, even though the Court of Appeals does not have jurisdiction of "equity cases." That was this Court's view in ruling on the application. We are bound by it because it is the law of *this* case. OCGA § 9-11-60 (h); *Jebco Ventures v. City of Smyrna*, 259 Ga. 599, 601 (1) (385 SE2d 397) (1989). That is so even though the application and this direct appeal are technically two separate cases. We cannot close our eyes to the reality that they are in fact the same appeal.

However, in the future we will follow *Auto Cash v. Hunt*, 216 Ga. App. 239 (454 SE2d 162) (1995), which held that since this Court only had jurisdiction over the efficacy of the summary judgment denials and not over the equitable relief, compliance with the interlocutory appeal procedure was required under OCGA §§ 5-6-34 (b) and 9-11-56 (h). That direct appeal, which had been transferred to this Court by the Supreme Court, was dismissed on that basis.

Although the trial court's ruling on the validity of the non-compete covenant was expressly interlocutory, requiring application to

appeal, we must now proceed with the direct appeal because this Court had earlier dismissed the interlocutory application. We cannot rule that both paths are the wrong ones, leaving appellant with no avenue for appellate review for want of jurisdiction in the Supreme Court and in the Court of Appeals by any of the paths provided by statute. In accordance with *Auto Cash,* supra, future potential appellants must follow the method for appealing the ruling complained of. Until and unless the Supreme Court changes its view of the scope of the Constitution's coverage of "all equity cases," the nature of the order containing the underlying contested issues of law will govern the appellate path in the Court of Appeals.

2. The direct appeal was docketed in this Court on July 10, 1995, with almost one year of life left for the non-compete covenant which Dr. Saxon sought to have rejected as legally unenforceable. Oral arguments were requested and heard on September 8. We consider the merits of the appeal in its turn, there having been no motion to expedite the decision, despite the running of the clock. The interlocutory injunction has been in force in the interim, because OCGA § 9-11-62 (a) provides: "Unless otherwise ordered by the court, an interlocutory or final judgment in an action for an injunction . . . shall not be stayed during the period after its entry and until an appeal is taken or during the pendency of an appeal." See *Howard v. Smith,* 226 Ga. 850 (178 SE2d 159) (1970), which explains that this is an exception to the automatic supersedeas provisions of OCGA § 5-6-46. Because of the lumbering process which has tortured this appeal by dragging it along and bouncing it from court to court, the issues have nearly become moot. There are only four months left for the non-compete covenants to have any effect, if they are valid.[2]

3. We turn, finally, to those questions.

Coastal Dialysis is a corporation operating a dialysis treatment facility in Savannah for kidney patients who have chronic renal disease. Saxton is a nephrologist who was employed by the corporation on a part-time basis as Assistant Medical Director and Assistant to the Chief Executive Officer, in addition to his primary profession and livelihood, practicing medicine. His medical office was in a different location than that of Coastal Dialysis. In theory, a patient of Saxton who needed dialysis could choose to obtain that service at Coastal Dialysis or at any available competing facility. In practice, the major-

---

[2] In the meantime, Coastal Dialysis filed an application for finding of civil contempt on June 9, 1995, in which it contended that Dr. Saxton had violated and was continuing to violate the injunction. The application was denied by the trial court after an evidentiary hearing, the order was certified for immediate review, application for interlocutory appeal was made to and denied by this Court, and the Supreme Court denied a petition for certiorari.

ity of Saxton's patients over the years chose to obtain their treatment at Coastal Dialysis.

Dr. Saxton's 1987 employment contract with Coastal Dialysis contained the following non-competition provision: "[D]uring the term of this Contract and a period of two (2) years following the termination of Employee's employment under this Contract for any reason whatsoever (other than willful misconduct on the part of the Clinic), Employee shall not, in exchange for any financial consideration, benefit, directly or indirectly, (i) own, manage, operate, or control, (ii) participate in the ownership, management, operation, or control of or (iii) be employed in a medical or managerial capacity by, any clinic, facility, program or unit (other than that of Physician's Health Care Services, Ltd., a Georgia corporation) which provides dialysis services and/or supplies to persons suffering from renal disorders. The geographical area in which the foregoing prohibition shall apply shall be limited to that area which is within a sixty (60) mile radius of City Hall, Savannah, Chatham County, Georgia." Some patients receiving treatment at Coastal Dialysis come from outside the 60-mile radius, and there are other competing clinics located within the region.

The agreement expressly allows Dr. Saxton to practice medicine and even to be on staff at a hospital which provides dialysis services. He is free to refer and admit his patients at that hospital so long as his salary or compensation does not exceed $25,000 per year in exchange for his services or expertise in connection with the operation or management of the hospital's renal disorder clinic.

At no time was he a shareholder or director of Coastal Dialysis but, by agreement, he did serve as the interim Chief Executive Officer and Physician Director for Coastal Dialysis a little less than a year. As the CEO, Dr. Saxton implemented all management decisions of the board of directors and was party to all management discussions.

After Dr. Saxton resigned effective July 1, 1994, he began taking several significant actions with a goal towards opening his own dialysis clinic in spring 1995. The suit and interlocutory injunction resulted.

Each of the arguments that Saxton has briefed in this Court was generally addressed by the trial court in its order. Saxton first argues the trial court erred in enforcing the non-compete clauses because they violate the rule of cases such as *Puritan/Churchill Chem. Co. v. Eubank*, 245 Ga. 334 (265 SE2d 16) (1980). It holds that a non-competition agreement will not be enforced when it restricts the scope of a former employee's activities with a future rival employer more broadly than is necessary, the rationale being that the agreement should be no more restrictive than necessary to protect the legitimate business interest of the employer. Id. at 335. Although the court

found Saxton's contract to be drafted as broadly as possible, it also determined that "[i]n the unusual circumstances of this case, the court finds that the unusually broad and iron-clad restrictions are reasonable," because the "shareholders entrusted all aspects of their business to Dr. Saxton. . . . Because of that experience, and the information and expertise gained thereby, it was reasonable, in terms of the interests to be protected, to prohibit him temporarily from any employment (or ownership) in any capacity with a local competitor." This finding is fully supported by the record and the law. See *Johnson v. Lee*, 243 Ga. 864, 866 (257 SE2d 273) (1979).

Saxton also argues that, contrary to the court's factual finding, he had access to no confidential information. The record shows otherwise.

He next argues that the geographic boundaries are unreasonable, in that it was beyond the legitimate business interest of Coastal Dialysis to have the restrictive covenant govern an area greater than Savannah. However, the evidence presented at the hearing indicated that Coastal Dialysis attracted patients from throughout the restricted area.

Dr. Saxton contends the court erred in refusing to find that Coastal Dialysis breached the employment agreement by not paying Saxton beyond May 25, 1994 to July 1, 1994. But the uncontroverted evidence at the hearing was that Saxton told Coastal Dialysis' general counsel that he only wanted to be paid through May 25, 1994.

He also argues that the duration of two years is "questionable," in that the public's interests in having convenient dialysis centers requires that the covenant be as short as possible. This argument was expressly rejected in *Rash v. Toccoa Clinic Med. Assoc.*, 253 Ga. 322, 326 (3) (320 SE2d 170) (1984).

Saxton maintains that Coastal Dialysis had an adequate remedy at law, although he does not include it among his enumerations of error. However, an injunction will lie in restrictive covenant cases even where damages are also sought. *Nat. Settlement Assoc. of Ga. v. Creel*, 256 Ga. 329, 332 (4) (349 SE2d 177) (1986).

Finally, Dr. Saxton urges that the employment contract was illegal. OCGA § 13-8-1. He cites no legal authority or facts to support this contention, other than Dr. Saxton's testimony that it constituted "fraud and abuse." This enumeration is also without merit.

Enforcement of the covenant is not error.

*Judgment affirmed. Pope, P. J., and Ruffin, J., concur.*

DECIDED MARCH 7, 1996 —
RECONSIDERATION DENIED MARCH 25, 1996 —

*Royal & Vaughan, J. Scott Vaughan,* for appellant.
*Ellis, Painter, Ratterree & Bart, Paul W. Painter, Jr.,* for appellee.