## A99A0202. KEELEY v. CARDIOVASCULAR SURGICAL ASSOCIATES, P.C.
### (510 SE2d 880)

BEASLEY, Presiding Judge.

After a bench trial, the court in a thorough explanatory order enjoined Dr. Samuel Keeley from violating a noncompete covenant in favor of Cardiovascular Surgical Associates, P.C. ("CSA"). Dr. Keeley contends on appeal that (i) CSA lacks standing to enforce because it neither exists any longer as a professional corporation nor employs surgeons, and (ii) the covenant is unenforceable as vague, geographically overbroad, and lacking in consideration. We hold that Keeley waived the standing issue and that the covenant, which forbids the establishment of a cardiovascular surgical practice within seventy-five miles of Albany for a period of two years, is clear and enforceable.

Dr. Roberts was a cardiovascular surgeon/owner of CSA located in Albany when he died. Keeley, a cardiovascular surgeon practicing in Columbus, contacted CSA for the vacant position. He negotiated a $300,000 salary plus bonus and benefits and an 18-month track to becoming an equal owner of CSA. An agreement memorialized the terms, including the following noncompete covenant similar to that of the other surgeons practicing with CSA: "In the event either of us terminate your employment or dissolve the partnership, a restrictive covenant would operate to prohibit your establishing a competing cardiovascular surgery practice within a 75 mile radius of Albany, Georgia for a period of two years following the date of termination or dissolution."

Several months after Keeley began practicing at CSA, CSA discovered he was personally abusing drugs. Keeley admitted drug use and entered a substance abuse treatment program. CSA terminated his employment soon thereafter in January 1998.

Keeley returned in May, announced he intended to establish his own cardiovascular surgical practice in Albany, and filed a declaratory judgment action to have the covenant declared unenforceable. CSA counterclaimed to enjoin Keeley from violating the covenant. The court agreed with CSA and enjoined Keeley accordingly through January 2000.

1. Citing OCGA § 14-7-5 (e), Keeley first argues that after Roberts' death, CSA failed for over six months to redeem, cancel or transfer his shares, thereby causing the corporation to cease to be a professional corporation and rendering it unable to engage in a medical practice. He relies on *Broome v. Ginsberg*[1] to support his contention that the defunct corporation could no longer enforce a covenant that

---

[1] 159 Ga. App. 202, 203 (3) (283 SE2d 1) (1981).

would not benefit it.

"When a party desires to raise an issue as to the legal existence of any party [or] the capacity of any party to bring or defend an action, . . . he shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge."[2] Failure to properly raise the issue before judgment will result in its waiver.[3]

Keeley affirmatively averred in his declaratory judgment petition that CSA was a professional corporation organized and existing under the laws of Georgia and was engaged in providing cardiovascular surgical services. CSA admitted the same in its answer. At no point did Keeley seek to amend or withdraw these averments of fact. "Under OCGA § 24-3-30, admissions in judicio in a party's pleadings bind the party so that they cannot put up evidence over objection to contradict such admissions. . . . If the party making the admission in judicio wishes to contravene the admission, then the party must first amend the pleading to withdraw the admission in judicio before such evidence may be submitted."[4]

Even if Keeley had raised the issue in pleadings, the agreed pretrial order that expressly superseded the pleadings did not raise the issue.[5] Such an order "limits the issues for trial to those not disposed of by admissions or agreements of counsel."[6] Consequently, the issue was waived.[7]

Keeley urges that the issue of CSA's corporate status was raised in the pretrial order. But Keeley orally admitted to the court that "[t]ruthfully, this first issue was not in the pretrial order." The court, which entered the pretrial order, ruled the matter was not in it. This is not disturbed because there is absent an abuse of discretion.[8]

---

[2] OCGA § 9-11-9 (a).

[3] *Patterson v. Duron Paints of Ga.*, 144 Ga. App. 123, 124 (1) (a) (240 SE2d 603) (1977); see *Guthrie v. Bank South*, 195 Ga. App. 123, 124 (2) (393 SE2d 60) (1990); *Youmans v. Riley Properties*, 180 Ga. App. 176 (349 SE2d 1) (1986); *Klorer-Willhardt, Inc. v. Martz*, 166 Ga. App. 446, 447 (1) (304 SE2d 442) (1983); *Dorsey Heating &c. Co. v. Gordon*, 162 Ga. App. 608, 610 (292 SE2d 452) (1982).

[4] (Citations omitted.) *Wahnschaff v. Erdman*, 232 Ga. App. 77, 78 (1) (502 SE2d 246) (1998); see *Aycock v. Calk*, 228 Ga. App. 172, 173 (491 SE2d 383) (1997) ("[w]here admissions in judicio have not been expressly withdrawn, the party is bound by such admissions"); *Strozier v. Simmons U.S.A. Corp.*, 192 Ga. App. 601, 603 (385 SE2d 677) (1989) ("[d]efendants never expressly withdrew the admissions contained in their pleadings, which means they were bound by the admissions").

[5] See *Ford v. Uniroyal Goodrich Tire Co.*, 231 Ga. App. 11, 15 (497 SE2d 596) (1998); Uniform Superior Court Rule 7.2.

[6] OCGA § 9-11-16 (b).

[7] *Long v. Marion*, 257 Ga. 431, 433 (2) (360 SE2d 255) (1987) ("[i]f a claim or issue is omitted from the order, it is waived") (citations and punctuation omitted); *Morris v. Shah*, 196 Ga. App. 886 (397 SE2d 207) (1990) (failure to raise standing in pretrial order waives issue).

[8] *Ga. Power Co. v. O'Bryant*, 169 Ga. App. 491, 495 (313 SE2d 709) (1984).

The issue was finally raised in a motion to dismiss following the close of evidence. Despite an invitation to do so, Keeley did not move to amend the pretrial order, and the court did not do so. Resolution of this dilemma is guided by the rationale in a previous case: "[w]hile the trial judge might, under the particular facts of some case, modify the pretrial order without request to prevent manifest injustice, it is difficult to imagine any case where it could be held that the trial judge abused his discretion in failing to modify a pretrial order where there had been no motion for such modification before or during the trial. Since appellant did not request any modification of the pretrial order, we find no error in the trial court's adherence thereto."[9] Even if Keeley's motion to dismiss was a tacit motion to amend the pretrial order, the trial court did not abuse its discretion in denying the motion, particularly since it came after the close of the evidence.[10]

Keeley argues the pretrial order and the pleadings were implicitly amended to withdraw the admissions and to include this issue when evidence was introduced, through stipulation, that Roberts' shares had not been transferred, canceled, or redeemed. But the court explicitly ruled that it was not considering this evidence on its merits and was not amending the pretrial order or the pleadings. When the court in a bench trial admits evidence that conflicts with admissions in the pleadings but "elects not to consider the issue *on the merits*, the admission of fact made in the pleadings remains in full force and effect as an admission in judicio and is conclusive of the fact admitted. Basically, the rule vests the trial court with discretion to determine whether an admission of fact made in pleadings should be withdrawn, thereby allowing the pleadings to be amended by conflicting evidence admitted and considered on the merits."[11]

It was not error to rule that Keeley had waived any issues regarding standing.

2. Keeley claims the court erred in finding CSA's business interests would be protected by enforcement of the covenant. The two current shareholders of CSA are cardiovascular surgeons who are no longer directly employed by CSA but rather operate in the form of separate professional corporations (named after each of them) which perform surgical services on CSA's patients. Because CSA no longer has any surgeon/employees, Keeley posits it no longer has any busi-

---

[9] (Citations and punctuation omitted.) *Morris v. Nat. Western Life Ins. Co.*, 208 Ga. App. 443, 445 (2) (430 SE2d 813) (1993).

[10] *DeBerry v. Knowles*, 172 Ga. App. 101, 105-106 (321 SE2d 824) (1984); *Patterson*, supra, 144 Ga. App. at 125.

[11] (Citations and punctuation omitted; emphasis in original.) *Wilson v. Ortiz*, 232 Ga. App. 191, 197 (3) (501 SE2d 247) (1998). Compare *Ballenger Paving Co. v. Gaines*, 231 Ga. App. 565, 570 (1) (b) (499 SE2d 722) (1998) (admission withdrawn when court allowed jury to consider evidence on merits).

ness interests that would be protected by enjoining him from establishing a cardiovascular surgical practice in the protected territory. To be sure, in order to be enforceable a noncompete covenant must be reasonably necessary to protect the interest of the party in whose favor it is imposed.[12] It must afford some corresponding benefit or protection to that party.[13]

The court found that CSA was in the business of providing medical services, including cardiovascular surgery. It found further that CSA had developed a substantial patient base and network of referring physicians throughout the protected territory. The court concluded that enforcement of the covenant would protect the corporation's legitimate business interests.

A judge's factfindings are not disturbed if there is any evidence to support them.[14] CSA produced records showing it had thousands of patients and numerous referring physicians throughout the area. CSA's shareholder and chief executive officer, who by law is considered an employee of CSA,[15] actively practices cardiovascular surgery on CSA's patients as does the other shareholder. CSA refers its patients to these two surgeons, who in turn use and pay CSA for the services of a physician's surgical assistant. The surgeons also use and pay CSA for the services of its office manager, who sets the appointments, does the bookkeeping, and runs their offices. Not only is CSA directly involved in the provision of the surgical procedures, but a reduction in the number of procedures would reduce its patient and referral base as well as its income and reputation. This all supported the finding that Keeley's intended violation of the covenant would adversely affect CSA's business interests.

3. Keeley attacks the covenant as geographically vague. Citing *Hamrick v. Kelley*,[16] Keeley contends that one cannot discern from where the 75-mile radius is to be measured. *Hamrick* does not stand for the proposition that noncompete covenants establishing a territory as a certain number of mile radius from a city are vague. It focuses instead on the impossibility of clearly defining the term used there ("Metro Atlanta") so that a center could be established from which to measure the radius. Where a city (as opposed to a metropolitan area) is designated as the center of the radius, the vagueness found in *Hamrick* is avoided.[17]

---

[12] *W. R. Grace & Co. v. Mouyal*, 262 Ga. 464, 465 (1) (422 SE2d 529) (1992).

[13] *Rakestraw v. Lanier*, 104 Ga. 188 (1) (30 SE 735) (1898).

[14] *Marshall v. SDA, Inc.*, 234 Ga. App. 312 (1) (506 SE2d 661) (1998).

[15] See OCGA § 14-2-140 (8).

[16] 260 Ga. 307, 308 (392 SE2d 518) (1990).

[17] See, e.g., *Nat. Settlement Assoc. of Ga. v. Creel*, 256 Ga. 329, 331 (3) (b) (349 SE2d 177) (1986) (upholding 200-mile radius of Atlanta); *Rash v. Toccoa Clinic Med. Assoc.*, 253 Ga. 322, 323 (1) (320 SE2d 170) (1984) (upholding 25-mile radius of Toccoa); *McMurray v.*

Keeley says that using Albany as the center is vague, for one cannot determine whether the 75 miles is to be measured from Albany city limits or from downtown Albany or elsewhere. The construction of a contract is a question of law for the court.[18] Unless specifically designated otherwise,[19] measuring from the city limits would be inconsistent with use of the word radius, which normally refers to a circle, not a jagged series of line segments. "The use of the word 'radius' presupposes a circle, the center of which is the center of [Albany]. It takes no considerable construction to place the center of that circle in the middle of downtown [Albany], giving a clear starting place for measuring the area" of restriction.[20] Measuring from the intersection where streets change from north to south and from east to west is the logical locus for that center point. The territorial description was sufficiently definite.

4. Keeley claims the described area, a circle with a 75-mile radius, is too large and overprotects the legitimate business interests of CSA. True, a covenant which includes more territory than necessary to protect the legitimate business interests of the employer is not enforceable.[21] He focuses on the inclusion of other heart surgical centers (where CSA admitted it had no business interests to protect) in the restricted area if one measured from Albany city limits. This approach is flawed for several reasons.

First, as explained above, measuring a radius from the city limits would be illogical.

Second, the court found that CSA had a substantial patient base and a network of referring physicians throughout the 75-mile radius. It also found that cardiovascular surgery draws its patients from large geographical areas because of restrictions on where that surgery can be performed. Evidence supported these findings.

Keeley claims that no Georgia court has ever upheld a physician's covenant covering so many square miles, but this argument fails. Keeley was to become an equal owner of CSA within 18 months, which means this covenant was not subject to the strict level of scrutiny accorded normal employment contracts, but to the middle level of reduced scrutiny accorded professional contracts where the parties

---

*Bateman*, 221 Ga. 240, 255 (4) (144 SE2d 345) (1965) (upholding 50-mile radius of Forest Park); *Adcock v. Speir Ins. Agency*, 158 Ga. App. 317 (279 SE2d 759) (1981) (upholding 13-mile radius of Forest Park).

[18] *Travelers Ins. Co. v. Blakey*, 255 Ga. 699, 700 (342 SE2d 308) (1986).

[19] See, e.g., *Nunn v. Orkin Exterminating Co.*, 256 Ga. 558, 559 (1) (350 SE2d 425) (1986) ("'a radius of ten miles of and from the official geographical boundaries of each aforementioned city and town'").

[20] *Hamrick*, supra, 260 Ga. at 309 (3) (Benham, J., dissenting).

[21] *Wulfhorst v. Hudgins & Co.*, 231 Ga. 170, 172 (200 SE2d 743) (1973).

are considered as having equal bargaining power.[22] "Cases decided under the lesser scrutiny of [such] agreements have consistently upheld territorial restrictions expressed in terms of a certain number of miles radius of a city. . . . [C]ases using this lesser scrutiny have also focused on whether the restricted area coincides with the territory served by the *employer*, not by the *employee*."[23]

The size of the territory necessary to protect CSA's business interests was a question to be determined "in view of the facts and circumstances surrounding the case. [Cit.]"[24] Evidence supported the court's reasonable findings; CSA attracted patients and referrals from throughout the designated area.[25]

5. The last issue is whether the covenant is avoided because Keeley and CSA had already reached an agreement as to all terms of his employment before CSA sent him the letter agreement, which allegedly for the first time introduced the noncompete covenant. Keeley claims the new term, which he did sign prior to employment, lacks consideration.

The court found that the agreement was still being negotiated at the time Keeley received the written agreement and that it constituted the agreement. Evidence supported this finding, for even Keeley conceded that his specific employment benefits had not been outlined until the letter. What is more, the letter starts with its clear intent: "This letter is written to confirm our mutual interest in having you join our practice. The following is an outline of the terms under which you would join the practice: . . . ." The covenant is listed.

*Judgment affirmed. Barnes, J., and Senior Appellate Judge Harold R. Banke concur.*

DECIDED JANUARY 12, 1999.

*McCall & Finney, Earl McCall, Fred T. Finney, Donaldson, Bell*

---

[22] *McAlpin v. Coweta Fayette Surgical Assoc.*, 217 Ga. App. 669, 672-673 (2) (458 SE2d 499) (1995); see *Habif, Arogeti & Wynne, P.C. v. Baggett*, 231 Ga. App. 289 (1) (498 SE2d 346) (1998).

[23] (Footnotes omitted; emphasis in original.) Id. at 293-294 (2) (b).

[24] *Barry v. Stanco Communications Products*, 243 Ga. 68, 70 (3) (252 SE2d 491) (1979).

[25] See *Saxton v. Coastal Dialysis &c. Clinic*, 220 Ga. App. 805, 809 (3) (470 SE2d 252) (upholding sixty-mile radius because clinic "attracted patients from throughout the restricted area"), modified on other grounds, 267 Ga. 177 (476 SE2d 587) (1996); *McAlpin*, supra, 217 Ga. App. at 673 (2) (upholding ten-county territory because professional corporation had patients in all ten counties). Compare *Creel*, supra, 256 Ga. at 331 (3) (b) (200-mile radius upheld because employee and employer did business throughout substantial portion of area).

& *Pickett, George P. Donaldson III, Reginald J. R. Bell, Jr.*, for appellant.

*Reinhardt, Whitley, Wilmot & Summerlin, Robert C. Wilmot, R. H. Pittman III*, for appellee.