## A00A1476, A00A1477. PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C. v. MACNEILL et al.; and vice versa.

(539 SE2d 216)

MIKELL, Judge.

The issues in this case revolve around the departure of three physician shareholders from Physician Specialists in Anesthesia, P.C. ("PSA"), a group medical practice specializing in anesthesiology, critical care, and pain management. The three doctors, appellees/cross-appellants Randy Rizor, Charles A. MacNeill, Jr., and John G. Porter ("Physicians"), filed suit to recover deferred compensation allegedly owed to them pursuant to a Shareholders' Agreement ("Agreement") entered into on May 17, 1993, between PSA and its thirteen physician shareholders. PSA defended on the ground that it is entitled to retain the deferred compensation as liquidated damages because the Physicians breached various restrictive covenants when they formed a competing medical practice. PSA also counterclaimed, alleging the Physicians breached their fiduciary duty to PSA, tortiously interfered with PSA's contractual and business relations, and breached the Agreement's implied covenant of good faith and fair dealing.

The voluminous record reveals a myriad of disputed and undisputed facts relevant to this appeal. We present them chronologically as follows: Prior to 1990, only Drs. Stanley Mogelnicki and Donn Chambers were shareholders in PSA. All other physicians in PSA, including the plaintiffs, were employees. In 1990, Drs. Mogelnicki and Chambers sold shares of stock to ten physician employees, including the plaintiffs, and the shareholders executed an agreement.

PSA initially held an exclusive contract for the provision of anesthesia services at St. Joseph's Hospital ("St. Joseph's"). That contract ended, and in 1992, St. Joseph's contracted solely with Dr. Mogelnicki's professional corporation. It does not appear that Dr. Mogelnicki informed the other shareholders of PSA prior to securing the St. Joseph's contract exclusively for himself.

Dr. Mogelnicki's contract rendered the 1990 shareholders' agreement obsolete, and the shareholders, in May 1993, executed the instant Agreement. Under the new Agreement, the shareholders were allowed to continue to provide services at St. Joseph's despite the contract between the hospital and Dr. Mogelnicki's professional corporation. The Agreement contains the following restrictive covenant:

The Shareholders each individually covenant and agree that . . . for two years after sale of a shareholder's shares of the Corporation, shareholder will not come indirectly or directly,

in the territory of St. Joseph's Hospital to provide professional services or in the territory of any other location(s) at which the Corporation is providing clinical services (the "territory"), call upon or divert any patients of the Corporation whose name was divulged to shareholder by or through shareholder's employment with the Corporation or whose name or trade was obtained by shareholder for the Corporation on behalf of any person, firm or corporation which is in competition with the Corporation. . . .

The covenant also provides that for two years after the termination of employment, a shareholder will not, directly or indirectly, disclose any names or lists of patients, or any cost or pricing structure for patients, or utilize any such confidential information for the shareholder's advantage (the "nondisclosure clause"). The covenant prohibits a shareholder from hiring, or attempting to hire, PSA's employees (the "no-hire clause"). Finally, the Agreement provides that PSA shall be entitled to retain a shareholder's deferred compensation as liquidated damages in the event a shareholder breaches the restrictive covenant.

Prior to this Agreement, PSA's physician shareholders and three nonshareholders had incorporated PSA's pain practice as Physician Specialists in Pain Management, Inc. ("PSPM"). This was done primarily for accounting and billing purposes. In prior litigation between PSA and two of its former employees, we noted that the physician shareholders of PSA were also shareholders of PSPM, controlling the operations and management of PSPM.[1]

Drs. Rizor and MacNeill were PSA's most active pain management practitioners and sought to expand that portion of the practice. PSA did not share this philosophy. On August 7, 1995, Drs. Rizor and MacNeill offered to purchase PSPM from PSA, but ten of the fifteen physician shareholders of PSA voted to decline the offer. On September 5, 1995, Drs. Rizor and MacNeill, then joined by Dr. Porter, notified PSA of their intent to leave PSA. On or about that date, Dr. Rizor met secretly with St. Joseph's to discuss a pain management venture.

Dr. Mogelnicki learned of Dr. Rizor's meeting, and, on October 17, PSA terminated Dr. Rizor's employment. Later that month Dr. Rizor incorporated Physicians' Pain & Rehabilitation Specialists of Georgia, P.C. ("PPRSG"). Drs. MacNeill and Porter submitted their resignations to PSA on October 31, 1995, effective March 1, 1996, when they left to join PPRSG.

PSA had already terminated the employment of Dr. Rizor's

---

[1] *Physician Specialists in Anesthesia v. Wildmon*, 238 Ga. App. 730, 731 (521 SE2d 358) (1999).

brother, Russell Rizor, who had been PSA's practice administrator, based on his covert copying of patient records and other disloyal activities. Mr. Rizor formed Medical Services Corporation (MSC), in order to provide services to PPRSG. As president of MSC, Mr. Rizor executed a letter of confidentiality with a provider of medical services with whom PSA had been negotiating. This was done prior to Dr. Rizor's termination, and allegedly on his behalf.

Based on this evidence and the pleadings, the Physicians moved for summary judgment on their complaint and on PSA's counterclaim. The trial court granted the motion in part, ruling that the liquidated damages clause of the Agreement was an unenforceable penalty; that the noncompete and nonsolicitation covenants were void; and that PSA's counterclaim for tortious interference with contractual and business relations, breach of the implied covenant of good faith and fair dealing, and attorney fees failed as a matter of law. In Case No. A00A1476, PSA appeals the partial grant of summary judgment to the Physicians. We affirm, except that we hold a jury may award attorney fees to PSA in the event it finds bad faith as to the remaining count of PSA's counterclaim, the alleged breach of fiduciary duty.

In Case No. A00A1477, the Physicians cross-appeal the denial of their motion for summary judgment on PSA's claims that the Physicians breached the nondisclosure clause, the no-hire clause, and their fiduciary duties. We affirm.

### Case No. A00A1476

1. PSA contends that the trial court erred in ruling that the liquidated damages clause of the Agreement is an unenforceable penalty.

> In deciding whether a contract provision is enforceable as liquidated damages, the court makes a tripartite inquiry to determine if the following factors are present: First, the injury caused by the breach must be difficult or impossible of accurate estimation; second, the parties must intend to provide for damages rather than for a penalty; and third, the sum stipulated must be a reasonable pre-estimate of the probable loss.[2]

> Whether a specified sum constitutes liquidated damages or a

---

[2] (Punctuation omitted.) *Southeastern Land Fund v. Real Estate World*, 237 Ga. 227, 230 (227 SE2d 340) (1976).

penalty is a question of law.[3] In the instant case, the parties do not dispute that the financial harm caused by a shareholder's breach of the restrictive covenant would be difficult to estimate accurately. Thus, the first prong of the inquiry is satisfied. As for the second prong, we must examine the Agreement to glean the parties' intent.[4] Here, the parties agreed that "the amount of the Deferred Compensation is a reasonable estimate of liquidated damages and does not constitute a penalty." Thus, we cannot say that PSA failed the second prong as a matter of law.

However, the Physicians have demonstrated that the amount of deferred compensation calculated in accordance with the Agreement did not constitute a reasonable pre-estimate of the probable loss. In pre-Agreement correspondence, PSA's counsel recommended implementing a provision stating that "upon breach of the restrictive covenant the breaching physician assigns and releases his or her rights to their portion of accounts receivable as calculated under the deferred compensation formula." Counsel's proffered reason was that such a formula "would be practical, and easy to implement." Further, when asked why that specific mechanism was chosen, Dr. Mogelnicki replied that PSA's attorneys "thought it would be a just amount." The evidence thus shows conclusively that no effort was made to pre-estimate the loss. It follows that the clause constitutes a penalty.

PSA argues that because in hindsight, its expert witness's assessment of the damages resulting from the Physicians' breach of the restrictive covenants (between $474,000 and $780,000) is in the range of PSA's estimate of deferred compensation (approximately $600,000), the damages were a reasonable pre-estimate of PSA's losses. However, the law requires pre-estimation. The record is devoid of evidence that prior to the execution of the Agreement, PSA endeavored to estimate damages resulting from a potential breach of the restrictive covenants.

PSA incorrectly relies on *Kem Mfg. Corp. v. Sant*[5] and *Sheppard v. Columbus Packaging Co.*[6] for the proposition that the Physicians forfeited their right to receive deferred compensation by allegedly breaching the restrictive covenants. The contracts at issue in *Kem Mfg.* and *Sheppard* both provided that payments of benefits to employees were contingent on the employees' adherence to the contract's restrictive covenants. The Agreement in the case sub judice did not contain "contingent upon" language.

---

[3] *Roswell Properties v. Salle*, 208 Ga. App. 202, 205 (3) (c) (430 SE2d 404) (1993).
[4] Id.
[5] 182 Ga. App. 135 (355 SE2d 437) (1987).
[6] 146 Ga. App. 202 (245 SE2d 887) (1978).

Accordingly,

[w]e think a correct resolution of this issue must be found in the doctrine that "in cases of doubt the courts favor the construction which holds the stipulated sum to be a penalty, and limits the recovery to the amount of damages actually shown, rather than a liquidation of the damages."[7]

2. PSA next argues that the trial court erred in ruling that the territorial restriction in the Agreement's noncompete clause is unenforceably vague.

(a) The first step in our review is determining the proper level of scrutiny. Generally, restrictive covenants ancillary to professional partnership agreements are viewed with a middle level of scrutiny, while those found in employment contracts are strictly scrutinized.[8] As explained in *Rash v. Toccoa Clinic Med. Assoc.*,[9] partners hold relatively equal bargaining positions, while an employer's bargaining power is markedly superior to that of his or her employee. Normally, restrictive covenants in professional partnership agreements are mutually advantageous to all signatories, and the consideration flows equally among the contracting parties. These factors weigh in favor of the enforceability of restrictive covenants in partnership agreements.[10]

Thus, our determination in the case sub judice rests with the parties' relative bargaining strength. In this regard, the evidence shows that in 1992, Dr. Mogelnicki's professional corporation secured an exclusive contract for the provision of anesthesia services at St. Joseph's, triggering the need for the instant Agreement.

Dr. Rizor deposed that the shareholders felt vulnerable after Dr. Mogelnicki obtained the contract with St. Joseph's because he would then be able to form a new practice and exclude the other physicians. Dr. Rizor explained that the purpose of the restrictive covenant was to create a penalty substantial enough to prevent Dr. Mogelnicki from enticing other shareholders to join a new practice. Similarly, Drs. MacNeill and Porter deposed that the new Agreement, including the restrictive covenant, was intended to protect the remaining shareholders of PSA.

The Agreement treats Drs. Mogelnicki and Chambers preferentially to all other shareholders. Specifically, the Agreement exempts

---

[7] (Citation omitted.) *Southeastern Land Fund v. Real Estate World*, supra at 231.

[8] *Habif, Arogeti & Wynne v. Baggett*, 231 Ga. App. 289 (1) (498 SE2d 346) (1998).

[9] 253 Ga. 322, 325 (2) (320 SE2d 170) (1984).

[10] *Pittman v. Harbin Clinic Professional Assn.*, 210 Ga. App. 767, 770 (437 SE2d 619) (1993).

Dr. Mogelnicki from the restrictive covenant, permanently designates him as chair and medical director of the anesthesiology department, assigns him a permanent position on the board of directors, limits the circumstances under which his employment can be terminated, and prohibits the reduction of his compensation below a certain level. Also, the fact that Dr. Rizor was unable to prevent his own termination or his removal by Dr. Mogelnicki as director of PSPM is evidence of Dr. Rizor's inferior bargaining capacity.[11] Thus, the evidence indicates that the balance of power may have tipped in Dr. Mogelnicki's favor.

However, Dr. Chambers deposed that Dr. Rizor was the most actively involved shareholder in the process of revising the 1990 agreement. Dr. Rizor was president of PSA until a month or two prior to the execution of the 1993 Agreement, and as such, he had significant input into the drafting of the restrictive covenant. Not only were all of the shareholders physicians, they were specialists whose services were capable of generating considerable monetary benefit for PSA, for the other shareholders, and for themselves.

In the final analysis, we are unable to conclude as a matter of law that Dr. Mogelnicki exerted such bargaining power over the remaining shareholders as to render the restrictive covenant at issue subject to the strict level of scrutiny accorded standard employment contracts. Therefore, it will be subjected to "the middle level of reduced scrutiny accorded professional contracts where the parties are considered as having equal bargaining power."[12]

(b) Using the middle level of reduced scrutiny, we examine the territorial restrictions in the restrictive covenant at issue to determine whether, as the trial court found, they are unenforceably vague.

The noncompete clause provides in part as follows:

> The Shareholders each individually covenant and agree that . . . for two years after sale of a shareholder's shares of the Corporation, shareholder will not come indirectly or directly, in the territory of St. Joseph's Hospital to provide professional services or in the territory of any other location(s) at which the Corporation is providing clinical services (the "territory"). . . .

The reasonableness of a restrictive covenant is determined by examining its duration, territorial coverage, and scope of prohibited

---

[11] *White v. Fletcher/Mayo/Assoc.*, 251 Ga. 203, 207 (303 SE2d 746) (1983).
[12] *Keeley v. Cardiovascular Surgical Assoc.*, 236 Ga. App. 26, 30-31 (4) (510 SE2d 880) (1999).

activity.[13] This tripartite test is not applied arbitrarily, but as a "helpful tool in examining the reasonableness" of the underlying factual setting.[14]

The Physicians do not contend that the covenant is improperly limited either in the scope of activities prohibited or in its duration. Thus, our inquiry is limited to the territorial restriction. The trial court ruled that the limitation was unenforceable because the Physicians could not determine the prohibited territory when they signed the Agreement. This analysis is correct for cases interpreting employment contracts subject to strict scrutiny. For example, we recently held in *AGA, LLC v. Rubin*,[15] that a territorial restriction in a physician's employment contract which covered "any hospital" at which the employee "regularly perform[ed] services for Employer during the term of this Agreement"[16] was void on its face because the physician/employee could not determine the proscribed territory until his employment was terminated. In *Osta v. Moran*,[17] we held that a geographic limitation placed upon a physician/employee was too potentially restrictive because the locations of the employer's clinics were subject to change.

Unlike the physicians in *AGA* and *Osta*, the physicians in this case are shareholders, and we scrutinize the instant covenant less strictly. Accordingly, the issues are whether "the territory of St. Joseph's" is unreasonably vague and whether the territory includes locations into which the Physicians knew PSA planned to expand when they signed the Agreement.[18]

With regard to the first issue, the shareholders' various definitions of "the territory of St. Joseph's" attest to its vagueness. For example, Drs. MacNeill, Sween, and Yilling, another PSA shareholder, testified that they understood the term to mean the hospital's "campus." Dr. Porter defined it as the "campus" as well as the surrounding medical office buildings. Dr. Mogelnicki testified he "originally" believed the territory was limited to St. Joseph's, but now believes it includes other neighboring hospitals and medical office buildings. To Dr. Rizor, the territory means the "block of land that the hospital and its office buildings are on." He deposed that Dr. Mogelnicki stated the territory did not include neighboring hospitals. It is clear that this ill-defined territory falls far short of the "abso-

[13] *W. R. Grace & Co. v. Mouyal*, 262 Ga. 464, 465 (1) (422 SE2d 529) (1992); *McAlpin v. Coweta Fayette Surgical Assoc.*, 217 Ga. App. 669, 671 (1) (458 SE2d 499) (1995).
[14] *Pittman*, supra at 768.
[15] 243 Ga. App. 772 (533 SE2d 804) (2000).
[16] Id. at 773.
[17] 208 Ga. App. 544, 546-547 (2) (430 SE2d 837) (1993).
[18] See *Sysco Food Svcs. v. Chupp*, 225 Ga. App. 584, 586 (1) (484 SE2d 323) (1997).

lute" territorial restriction upheld in *Rash*,[19] which precluded the partner/physician from practicing within a 25-mile radius of Toccoa. It follows that the proscribed territory in the instant case is unreasonably vague.

With regard to the second issue, the contracting parties' knowledge about any planned expansions, the evidence shows that when the Agreement was executed, PSA and PSPM provided services only to St. Joseph's. By October 1995, PSA and PSPM had expanded to treating patients at four additional locations: Resurgens Surgery Center, Atlanta Outpatient Surgery Center ("AOSC"), Columbia Parkway Medical Center ("Parkway"), and the REACT Center at Windy Hill ("REACT"). According to Dr. Sween, PSA began providing services at AOSC in September 1995. The practice at Resurgens was opened in 1993. The record does not indicate when PSA or PSPM began rendering treatment at Parkway and REACT. The evidence at most indicates that the Physicians anticipated the expansion into Resurgens. However, we cannot reach the same conclusion regarding the other three new facilities. It follows that the territorial restriction is void for the additional reason that the Physicians were unaware of the expansion plans when they executed the Agreement.

We also reject PSA's assertion that the insertion of the language that "the territorial, time and other restrictions . . . constitute reasonable and equitable restrictions" saves the territorial restriction. While, as the Supreme Court noted in *Rash*,[20] this clause is an important consideration, it cannot save the territorial restriction from being unreasonably vague. It follows that the trial court correctly granted summary judgment to the Physicians on this issue.

3. Similarly, we hold that the Agreement's nonsolicitation clause is unenforceable as a matter of law, although for different reasons than the trial court specified. The trial court deemed the nonsolicitation clause unenforceable on the ground that the noncompete clause was void. However, *Habif, Arogeti & Wynne v. Baggett*[21] explained that a covenant not to solicit must be viewed on its own merits.

The clause under consideration provides that a shareholder may not, for two years after selling his or her shares to PSA,

> call upon or divert any patients of the Corporation whose name was divulged to shareholder by or through shareholder's employment with the Corporation or whose name or trade was obtained by shareholder for the Corporation on

---

[19] Supra at 325.
[20] Supra at 326 (3).
[21] Supra at 297-298 (3).

behalf of any person, firm or corporation which is in competition with the Corporation.

In *Baggett*, the Court, applying a middle level of scrutiny, upheld a nonsolicitation clause contained in an accounting partnership agreement which prohibited a former partner from soliciting those clients for whom the partner had done substantial work, for the purpose of performing accounting services. Here, the covenant contains no such limitations. The Physicians are not permitted to "call upon" any of PSA's patients, for any reason, and regardless of whether the Physicians had treated them. The covenant is overbroad, even under a reduced level of scrutiny.[22] In any event, Dr. Mogelnicki deposed that he could not name any patients whom the Physicians had called upon or diverted to their new practice. It follows that summary judgment was properly granted to the Physicians on this claim.

4. The trial court correctly ruled that PSA's claim of tortious interference with business or contractual relations fails as a matter of law.

To survive summary judgment on this claim, PSA must produce evidence to show that the Physicians acted improperly, without privilege, and with intent to induce a third party or parties not to enter into or continue a contract or business relationship with PSA, causing harm to PSA.[23] While the evidence raises questions of material fact on each of these elements, application of the "stranger doctrine" precludes PSA's claim as a matter of law.[24] The evidence does not show that the Physicians were strangers to any business relationship with which PSA alleges they tortiously interfered. Rather, PSA alleges that the Physicians, while employed by PSA, were complicit in the covert copying of patient files. Even if the allegation is true, the Physicians were not strangers to PSA's relationships with its patients. Accordingly, we are constrained to hold that the trial court correctly granted summary judgment to the Physicians on PSA's claim for tortious interference with business or contractual relations.[25]

5. Similarly, PSA's claim that the Physicians breached the Agreement's implied duty of good faith and fair dealing cannot sur-

---

[22] Id. at (3) (b). See also *Hogan Mgmt. Svcs. v. Martino*, 242 Ga. App. 791, 792 (530 SE2d 791) (2000) (covenant prohibiting physician from soliciting any patient, not only those with whom he actually had contact while working for medical corporation, held overbroad).

[23] *Parks v. Multimedia Technologies*, 239 Ga. App. 282, 291 (3) (f) (520 SE2d 517) (1999); see also *Jenkins v. Gen. Hosp. of Humana*, 196 Ga. App. 150, 151 (395 SE2d 396) (1990).

[24] *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 609-610 (2) (503 SE2d 278) (1998).

[25] However, the allegedly improper copying of patient files may constitute breach of fiduciary duty; see Division 9, infra.

vive summary judgment.

This implied duty "requires both parties to a contract to perform their promises and provide such cooperation as is required for the other party's performance."[26] In this regard, PSA argues that the Physicians have breached this duty by violating the restrictive covenants contained in the Agreement. This argument is merely a duplication of PSA's breach of contract claims.[27] Accordingly, summary judgment was properly granted to the Physicians on PSA's claim of breach of implied duty of good faith and fair dealing.

6. However, the trial court erred in granting summary judgment to the Physicians on PSA's claim for attorney fees and expenses of litigation under OCGA § 13-6-11.

That Code section permits a jury to award attorney fees "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." If a bona fide controversy exists, attorney fees may be awarded only if the defendant has acted in bad faith in the underlying transaction.[28]

A bona fide controversy exists in this case; therefore, in order to survive summary judgment on this claim, PSA must produce evidence that the Physicians acted in bad faith. Based on our holdings in Divisions 7, 8, and 9, infra, that genuine issues of material fact remain on whether the Physicians breached the Agreement's nondisclosure and no-hire clauses as well as their fiduciary duty to PSA, it is for a jury to determine whether PSA is entitled to recover attorney fees and expenses of litigation.

### Case No. A00A1477

7. The Physicians argue that the trial court erred in denying their motion for summary judgment as to the enforceability of the nondisclosure covenant. We do not agree. Further, genuine issues of material fact remain as to whether the Physicians violated the covenant.

The validity of a nondisclosure provision depends upon its reasonableness, which, in turn, hinges on two factors:

(1) whether the employer is attempting to protect confidential information relating to the business, such as trade secrets, methods of operation, names of customers, personnel data, and so on . . . ; and (2) whether the restraint is

---

[26] *Ihesiaba v. Pelletier*, 214 Ga. App. 721, 724 (2) (448 SE2d 920) (1994).

[27] See *McMann v. Mockler*, 233 Ga. App. 279, 281 (3) (503 SE2d 894) (1998).

[28] *Latham v. Faulk*, 265 Ga. 107, 108 (2) (454 SE2d 136) (1995); *Toncee, Inc. v. Thomas*, 219 Ga. App. 539, 542 (3) (466 SE2d 27) (1995).

reasonably related to the protection of the information.[29]

The nondisclosure covenant in the Agreement at issue provides that for two years after the termination of employment, a shareholder will not, directly or indirectly, disclose any names or lists of patients, or any cost or pricing structure for patients, or utilize any such confidential information for the shareholder's advantage. In the Agreement, the shareholders expressly "acknowledged that such customer names and lists are valuable assets" of PSA.

In *Durham v. Stand-By Labor of Ga.*,[30] our Supreme Court upheld a clause prohibiting the post-employment disclosure of "any information whatsoever concerning any customer," including the company's "method of doing business." The Court ruled that "the legitimacy of the need to maintain the confidentiality of such information is a question of fact whose resolution is for the court below."[31] As in *Durham*, we cannot conclude as a matter of law that the nondisclosure covenant in the case at bar is overbroad.

The Physicians rely on *Wolff v. Protégé Systems*,[32] which struck down as overbroad a clause prohibiting the disclosure of any of the employer's customers "or any other information pertaining to them." *Wolff* held that the information sought to be protected was available from other sources and therefore not necessary to protect the employer's legitimate business interests. Moreover, the employee had acquired information about many of the employer's customers before he became employed at the company. In contrast, the evidence in the instant case does not show that the Physicians had obtained such information prior to associating with PSA.

Nor do we find *Nasco, Inc. v. Gimbert*[33] to be apposite. In *Nasco*, the Supreme Court struck as overbroad a clause banning disclosure of "any information concerning any matters affecting or relating to the business of employer."[34] The Court reasoned that the clause affected "a great deal of public information concerning many matters which would affect or relate to the business of the employer; e.g., interest rates or minimum wage legislation."[35]

The Physicians argue that their ability to obtain pricing information from an insurance company shows as a matter of law that a portion of the information sought to be protected, i.e., the "cost or pricing structure for patients," was available to the general public.

---

[29] (Punctuation omitted.) *Kem Mfg. Corp. v. Sant*, supra at 139 (3).
[30] 230 Ga. 558, 559-560 (198 SE2d 145) (1973).
[31] Id. at 565.
[32] 234 Ga. App. 251 (506 SE2d 429) (1998).
[33] 239 Ga. 675 (238 SE2d 368) (1977).
[34] (Punctuation omitted.) Id. at 676 (3).
[35] Id.

We cannot agree that an insurer's disclosure of rates to a physician's office encompasses such broad availability. In any event, even if "the nondisclosure provision includes at least one item of information which is available to the public,"[36] the duty not to disclose is limited to use for competitive purposes. Thus, the nondisclosure clause is not overly broad.

Finally, the evidence raises a fact issue as to whether the Physicians breached their obligation not to disclose patient lists to PPRSG. PSA's bookkeeper, Yvette Stanley, testified that in February 1996, another employee subsequently terminated by PSA sent medical records by telecopier, without patients' consent, to Shannyn Duddles at MSC. Duddles, who had been Mr. Rizor's assistant at PSA and became his marketing director at MSC, admitted receiving the telecopied files. This evidence raises an issue of fact as to whether MSC was acting on behalf of the Physicians, such that the acts of MSC were a breach of the Physicians' contract with PSA. Accordingly, the trial court did not err in denying summary judgment to the Physicians on this claim.

8. Similarly, the trial court properly ruled that questions of material fact remain as to whether the Physicians breached the no-hire covenant.

The no-hire covenant provides that "shareholder will not . . . solicit or attempt to hire any other employee" of PSA for two years after termination of employment. In *U3S Corp. of America v. Parker*,[37] we upheld a virtually identical clause stating that a former employee could not "solicit or in any manner encourage employees of the Company to leave the employ of the Company" for two years after leaving the employer.[38] "Attempt to hire" may be reasonably interpreted to mean taking affirmative action to hire persons currently in the employ of PSA.

A medical transcriptionist for PSA, Sandra Lamoureux, averred that Dr. Rizor solicited her employment for a new pain clinic that he and Dr. MacNeill intended to form. The offer was made at a meeting, attended by other PSA employees, at the home of Dr. MacNeill. According to Lamoureux, Dr. Rizor stated to her that "offers of employment to those attending the meeting would need to be done in an indirect manner because of the restrictive covenants in the PSA Shareholders' Agreement." Similarly, Stanley deposed that after the shareholders voted against the sale of PSPM, Mr. Rizor asked if she would be interested in working for the new corporation he intended

---

[36] *U3S Corp. of America v. Parker*, 202 Ga. App. 374, 377-378 (2) (a) (414 SE2d 513) (1991).
[37] Id. at 376-377 (2) (a).
[38] Id.

to form. Dr. Rizor discussed a new corporation with Stanley. The evidence thus raises an issue for trial as to whether the Physicians breached the no-hire covenant.

9. Finally, the Physicians assign error to the trial court's ruling that a fact issue remained on PSA's breach of fiduciary duty claim. There was no error. "It is settled law that corporate officers and directors occupy a fiduciary relationship to the corporation and its shareholders, and are held to the standard of utmost good faith and loyalty."[39]

At the outset, we note that the shareholders expressly acknowledged their fiduciary relationship with PSA when they signed the Agreement. Further, the evidence shows that Dr. Rizor was president as well as a member of the board of directors of PSPM until September 12, 1995. Dr. MacNeill also served on the board of directors of PSPM. PSA and PSPM were inextricably intertwined. As such, Drs. Rizor and MacNeill are "held to the standard of utmost good faith and loyalty" to both PSA and PSPM.

Even if the Physicians were mere employees, an employee "is not . . . entitled to solicit customers for a rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business."[40]

In this regard, the evidence suggests that Dr. Rizor and his brother, Russell Rizor, made a presentation to St. Joseph's in September 1995 regarding a pain management practice they wished to open on the campus. Dr. MacNeill deposed that prior to his departure from PSA, he felt obligated to tell the 40 to 50 patients with whom he had an ongoing relationship that he would be leaving, and they could either stay with PSA or seek help elsewhere.

In addition, in July 1995, Dr. Mogelnicki undertook negotiations with AOSC to obtain a contract for PSA to provide pain management services there. After unsuccessfully trying to follow up with AOSC, Dr. Mogelnicki learned that Dr. Rizor was already providing pain management services for one of AOSC's facilities. According to Dr. Mogelnicki, AOSC's medical director had not returned Dr. Mogelnicki's telephone calls because Dr. Rizor had asked the director to sign a letter of confidentiality. Dr. Rizor deposed that he and Dr. Porter had met with AOSC during the first week of October to discuss providing pain services. Further, Mr. Rizor executed a confidentiality agreement on behalf of MSC with AOSC on October 9. Dr. Rizor admitted that MSC has no operations apart from serving

---

[39] (Citation omitted.) *Quinn v. Cardiovascular Physicians*, 254 Ga. 216, 217 (2) (326 SE2d 460) (1985).

[40] (Citation and punctuation omitted.) *E. D. Lacey Mills, Inc. v. Keith*, 183 Ga. App. 357, 363 (9) (359 SE2d 148) (1987).

PPRSG. A jury could construe these contacts with AOSC as evidence that the Physicians breached their fiduciary duty to PSA.

The evidence suggests other possible breaches by the Physicians. During the summer of 1995, Mr. Rizor instructed Duddles to photocopy patient files. This surreptitious mission was accomplished after business hours. Duddles initially hid the copies in the storage closet in her office, then turned them over to Mr. Rizor in December 1995. He testified that he threw them in a dumpster. When questioned about the incident, Mr. Rizor admitted it "must have had something to do with the new entity [PPRSG]. . . ." Additionally, Stanley averred that Duddles requested her assistance with copying records "for use by Dr. Rizor in a new medical practice he was forming." Stanley testified that she refused and informed Dr. Rizor of her belief that copying patient records for use outside of PSA was tantamount to stealing. Stanley also averred that Dr. Rizor stated he would see to it that the copying ceased. Dr. Rizor deposed that he had no knowledge of any copying of patients' records and was not the person who put a stop to it. It is for the jury to resolve these conflicts in the testimony.

Accordingly, in Case No. A00A1477, we affirm the denial of the Physicians' motion for summary judgment on the issues of breach of fiduciary duty, breach of the no-hire covenant, and breach of the nondisclosure covenant. In Case No. A00A1476, we affirm the grant of the Physicians' motion for summary judgment on the issues of the validity of the liquidated damages clause, the noncompete clause, and the nonsolicitation clause. We also affirm the grant of summary judgment to the Physicians on PSA's claims of tortious interference with business or contractual relations and breach of the implied covenant of good faith and fair dealing. However, we reverse the grant of summary judgment to the Physicians on PSA's claim for attorney fees.

*Judgment affirmed in Case No. A00A1477. Judgment affirmed in part and reversed in part in Case No. A00A1476. Pope, P. J., and Miller, J., concur.*

DECIDED SEPTEMBER 13, 2000 —
RECONSIDERATION DENIED OCTOBER 16, 2000.

*Decker & Hallman, Richard P. Decker, F. Edwin Hallman, Jr., Peter V. Hasbrouck*, for appellant.

*Parker, Hudson, Rainer & Dobbs, John H. Parker, Jr., Leo E. Reichert, David L. Fenstermacher*, for appellees.