[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 1, 2005
THOMAS K. KAHN
CLERK

No. 03-16248

D. C. Docket No. 03-00094 CV-4

PALMER & CAY, INC., a Georgia corporation,

Plaintiff-Appellee-
Cross-Appellant,

JAMES B. MEATHE,

Plaintiff-Counter-Defendant-
Appellee-Cross-Appellant,

versus

MARSH & MCLENNAN COMPANIES, INC.,
A Delaware corporation,

Defendant-Counter-Claimant-
Appellant-Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Georgia

_____

**(April 1, 2005)**

Before BIRCH, BARKETT and COX, Circuit Judges.

BIRCH, Circuit Judge:

This appeal arises from two employee and client non-solicitation agreements entered into between James B. Meathe, an insurance executive, and Marsh and McLennan Companies, Inc. ("MMC"), his former employer. The district court granted judgment on the pleadings in favor of Meathe and his current employer, Palmer & Cay, Inc. ("P&C"), and held that the agreements were unenforceable "within the state of Georgia" under Georgia public policy. The district court enjoined MMC from attempting to enforce the agreements within the state. We must determine whether the district court correctly granted judgment on the pleadings, and if so, whether it correctly curtailed the geographic scope of the declaratory judgment and injunctive relief to Georgia. We **AFFIRM** in part, **VACATE** in part, and **REMAND** for proceedings consistent with this opinion.

## I. BACKGROUND

As of March 1997, Meathe was employed at Johnson & Higgins ("J&H"), a national insurance brokerage. That spring, MMC acquired all outstanding shares of J&H, and J&H was merged into MMC. Meathe owned stock in J&H at the time

of the sale.[1]  In the exchange, he received a cash payment and shares of MMC

stock,[2] and he agreed to be bound by certain customer and employee non-

solicitation covenants incorporated into a written agreement ("the 1997

Agreement").[3]

The 1997 Agreement, entitled "STOCK PURCHASE AGREEMENT among

JOHNSON & HIGGINS, THE STOCKHOLDERS OF JOHNSON & HIGGINS

and MARSH & MCLENNAN COMPANIES, INC.,"  represents that it is between

J&H, the "Seller[s]", or J&H stockholders listed on Annex A to the 1997

---

[1] According to Meathe and P&C's Brief in Support of Motion for Judgment on the Pleadings, Meathe was one of 49 shareholders in J&H and owned 185 out of its 54,965 shares (or approximately one-third of one-percent of the company). R1-17 at 13.  To support this assertion, they cite Annex A to the Stock Purchase Agreement.  The Stock Purchase Agreement is attached as an Appendix to their brief, but Annex A to the Agreement is not included.  None of the parties' pleadings support the assertion.  Although MMC does not appear to dispute the percentage of J&H stock Meathe owned, we decline to rely on this unsupported factual allegation contained only in the parties' briefs.

[2] MMC asserts that Meathe received $2,921,699 in cash and 255,716 shares of MMC stock, which, distributed to Meathe over a four-year period, had an  "ultimate value" of $10,641,347. R2-25 at 11-12 ¶ 9.  Meathe admits this assertion in Plaintiffs' Answer. See Plaintiffs' Answer to Defendant's Amended Counterclaims. R2-27 at 3 ¶ 9.  However, in Plaintiffs' Reply Brief in Support of Motion for Judgment on the Pleadings, P&C and Meathe contend that Meathe was paid $1,128,628 in cash and $2,257,256 worth of MMC stock, or $3,385,884 in total  R2-22 at 5 n.3.  They contend that MMC arrives at the $10,641,347 "ultimate" figure by citing a later sale of the stock, which takes into account the stock's increase in value over time. Id.

[3] According to MMC, Meathe entered into the 1997 Agreement "in exchange for" the consideration he received in the sale.  R2-25 at 12 ¶ 10.  Meathe denies that the 1997 Agreement was entered into "in exchange for" the cash payment and shares of stock, R2-27 at 3 ¶ 10, and alleges that the agreement was entered into "both in connection with Meathe's employment by Marsh & McLennan and the sale by Meathe of his interest" in J&H. R1-4 at 3 ¶ 12.

Agreement, and the "Buyer," MMC.  R1-17, App. A, at 1.  Although their

submissions do not include Annex A, the parties do not dispute that Meathe sold

his stock as part of the 1997 Agreement.  Section 6.13(b) of the 1997 Agreement

sets out the non-competition and non-solicitation provision applicable to Meathe,

who was not a director of J&H:

> Section 6.13  Non-Competition and Non-Solicitation.
> . . . .
> (b) Each Seller who is not a director of the Company as of the date hereof hereby agrees that during the Non-Solicit Period, such Seller will not (x) solicit, accept or service business that competes with businesses conducted by the Company, Buyer or any of their Subsidiaries (i) from any clients or prospects of the Company or its affiliates who were solicited directly by Seller or where Seller supervised, directly or indirectly, in whole or in part, the solicitation activities related to such clients or prospects or (ii) from any former client who was such within two (2) years prior to such termination and who was solicited directly by Seller or where Seller supervised, directly or indirectly, in whole or in part, the solicitation activities related to such former client; or (y) solicit any employee of the Company or its affiliates to terminate his employment.

Id. at 69-70.[4]  The section also establishes the length of the non-solicitation

period:

> The Non-Solicit Period shall commence on the Closing
> Date and end on the later of the fifth anniversary of the
> Closing Date and the second anniversary of the date on
> which such Seller is no longer employed by the

---

[4] Section 6.13(a) sets out the non-competition and non-solicitation provision applicable to J&H directors who sold stock as part of the transaction.  See id.

4

Company, Buyer or any of their respective Subsidiaries.

Id. at 70. The 1997 Agreement's "Definitions" section contains a list of five individuals whose actual knowledge could impute knowledge to J&H for purposes of the agreement. Meathe is not included on the list. Id. at 105, § 11.3(d). Additionally, the agreement contains a merger clause. Id. at 89, § 10.4.

MMC employed Meathe from March 1997 to 2003. By 2003, Meathe was Managing Director and Head of the Midwest Region for Marsh USA, Inc., one of MMC's subsidiary corporations. R2-25 at 13 ¶ 13; R2-27 at 4 ¶ 13. In this position, according to MMC, Meathe's duties included soliciting and servicing clients in Marsh's Midwest region, supervising 2,600 sales employees, formulating business strategy, managing Marsh's finances for the region, and crafting business policies and procedures. R2-25 at 13 ¶ 14.[5] According to MMC, Meathe had access to confidential information relating to the servicing of clients. MMC alleges that this information, not known outside of the company, gives Marsh a competitive advantage in the marketplace.[6] R2-25 at 14 ¶ 15. In 2003, MMC paid Meathe approximately $725,000 in salary and bonuses. R2-25 at 13 ¶ 13.

---

[5] Meathe denies that his duties included the solicitation of clients. R2-27 at 4 ¶ 14.

[6] Meathe denies these assertions. R2-27 at 4 ¶ 15.

On 27 December 2002, Meathe signed another client and employee non-solicitation agreement ("the 2002 Agreement") in exchange for rights to exercise certain MMC stock options.[7] R2-25 at 12-13 ¶¶ 11, 12. In the 2002 Agreement, Meathe agreed to be bound by customer and employee non-solicitation covenants set to expire two years after Meathe's last day of work at MMC, provided his employment with MMC ended within three years of his exercising the stock options. Meathe promised not to:

> (a) solicit or accept business of the type offered by the Company during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for (i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or (ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

> (b) solicit any employee of the Company who reported to me directly or indirectly to terminate his employment with the Company for the purpose of competing with the Company.

---

[7]According to MMC, Meathe exercised the options for a $252,678.30 profit. R2-25 at 13 ¶ 12. Meathe denies this assertion and claims that the consideration given for the 2002 Agreement was his employment. R2-27 at 3 ¶ 12.

R1-17 at App. B. Meathe also recognized and acknowledged MMC's trade secrets and confidential proprietary information and promised not to disclose them or use them for the benefit of himself or an entity other than Marsh.[8]

Meathe left Marsh's employ on 1 January 2003. R2-25 at 13 ¶ 13; R2-27 at 4 ¶ 13.[9] In February 2003, Meathe became President of P&C, an insurance brokerage company and direct competitor of Marsh. R2-25 at 14 ¶ 16; R2-27 at 4 ¶ 16. Meathe moved to Georgia around that time. According to MMC, MMC informed Meathe on 24 July 2003 that it would not attempt to enforce the contract

---

[8]Specifically, the agreement provided:

> I [Meathe] recognize and acknowledge that the Company's trade secrets and confidential or proprietary information, including such trade secrets or information as may exist from time to time, are valuable, special and unique assets of the Company's business, access to and knowledge of which were essential to the performance of my duties while in the employ of the Company. I will not, during or after the term hereof, in whole or in part, disclose such secrets or confidential or proprietary information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, nor shall I make use of any such property for my own purposes or for the benefit of any person, firm, corporation or other entity (except the Company) under any circumstances, during or after the term hereof, provided that after the term hereof, these restrictions shall not apply to such secrets or information which are then in the public domain (provided that I was not responsible, directly or indirectly, for such secrets or information entering the public domain without the Company's consent).

R1-17, App. B.

[9] Meathe alleges that he left Marsh by mutual agreement. R2-27 at 4 ¶ 13.

7

term in the 2002 Agreement that prohibited Meathe from accepting business from clients who switched, on their own and unsolicited by Meathe, to P&C. R2-22 at 14 ¶ 17. MMC contends that it took this measure to modify the 2002 Agreement so as to bring it into conformance with Georgia law.

Although the 1997 Agreement's five-year non-solicitation period had expired by the time P&C employed Meathe, both the 1997 Agreement and 2002 Agreement's two-year non-solicitation periods, set to expire 1 January 2005, were still in effect. In district court, Meathe and P&C sought a judgment enjoining MMC from enforcing the 1997 Agreement and the 2002 Agreement. MMC counterclaimed, arguing, <u>inter</u> <u>alia</u>, that Meathe violated covenants of the 1997 and 2002 Agreements in order to expand P&C's business in the Midwest.[10] Meathe and P&C moved for judgments on the pleadings. Granting their motions in part, the district court declared the 1997 and 2002 Agreements "unenforceable within the State of Georgia" and enjoined MMC from enforcing the covenants "against Meathe in Georgia." <u>Palmer & Cay, Inc. v. Marsh & McLennan Cos.</u>, No. 403CV094 at 11 (S.D. Ga. Nov. 11, 2003) (order granting judgment on the

---

[10] Specifically, MMC alleges that Meathe has induced Marsh employees to resign from MMC to join P&C and has solicited certain Marsh clients to leave Marsh and bring their business to P&C. MMC also alleges that Meathe has used and disclosed MMC/Marsh confidential business information and trade secrets.

pleadings).

On 26 November 2003, MMC filed a timely notice of interlocutory appeal under 28 U.S.C. § 1292(a)(1). On 1 December 2003, the district court ruled <u>sua sponte</u> that there was "no just reason for delay" and certified the case for immediate appeal, pursuant to Federal Rule of Civil Procedure 54(b). R2-30. In its order, the district court stayed discovery pending appeal and administratively closed the case, subject to a reopen motion by any party with standing. P&C and Meathe filed a timely notice of cross appeal.

On appeal, MMC argues that the district court erred by (1) failing to follow the standard for judgments on the pleadings, dictated by Federal Rule of Civil Procedure 12(c), by drawing factual inferences against MMC, the non-movant; and (2) concluding that the 1997 and 2002 Agreements were unenforceable under Georgia law.[11] On cross-appeal, P&C and Meathe contend that the district court erred in limiting the scope of its injunction and declaratory judgment to Georgia under <u>Keener v. Convergys Corp.</u>, 342 F.3d 1264 (11th Cir. 2003).

## II. DISCUSSION

[11] MMC also argues that the district court erred in failing to enforce independently the employee non-solicitation covenants of the 1997 and 2002 Agreements. We conclude that MMC did not raise this issue in the district court. Because MMC's appeal presents none of the "exceptional circumstances" in which we may exercise appropriately our discretion to hear issues raised for the first time on appeal, we do not consider this argument. <u>See</u> <u>Dean Witter Reynolds, Inc. v. Fernandez</u>, 741 F.2d 355, 360-61 (11th Cir. 1984).

A.	Standard of Review

We review the district court's grant of judgment on the pleadings de novo. Horsley v. Feldt, 304 F.3d 1125, 1131 (11th Cir. 2002). "'Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law.'" Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1291 (11th Cir. 2002) (citation omitted). The court must view the facts "in the light most favorable to the nonmoving party," and it can grant the motion only if the non-movant "'can prove no set of facts'" which would allow it to prevail. Horsley, 304 F.3d at 1131 (citation omitted).

B.	The 1997 Agreement

Under Georgia law, the level of scrutiny applied to a covenant not to compete depends on whether it is ancillary to the sale of a business or ancillary to employment.[12] If ancillary to the sale of a business, a covenant can be enforced "'to the extent that it is found essential . . . to protect the purchaser, despite the overbreadth of the covenant.'" White v. Fletcher/Mayo/Assocs., Inc., 303 S.E.2d 746, 749 (Ga. 1983) (quoting Redmond v. Royal Ford, Inc., 261 S.E.2d 585, 587

_____

[12] A third level of scrutiny applies to professional partnership agreements. Georgia courts apply intermediate scrutiny because signatory partners hold relatively equal bargaining power, enjoy mutual advantage from the restrictive covenants, and share equally in the consideration. See Physician Specialists in Anesthesia, P.C. v. MacNeill, 539 S.E.2d 216, 221 (Ga. Ct. App 2000).

10

(Ga. 1979) (per curiam)). Georgia courts apply a low level of scrutiny to agreements ancillary to the sale of a business, Swartz Investments, LLC v. Vion Pharmaceuticals, Inc., 556 S.E.2d 460, 463 (Ga. Ct. App. 2001), and they can reform, or "blue-pencil,"[13] any objectionable portions to bring them in conformance with Georgia law, White, 303 S.E.2d at 749. Georgia courts reason that these covenants form part of the bargained-for exchange in the sale:

> [T]he buyer pays and the seller receives a part of the total purchase price as consideration for that covenant. The buyer frequently would not buy the business if the seller were free to begin competing immediately. By restricting the territory to an area less than that specified in the covenant, the court requires the seller to do that which the buyer and seller bargained for, yet in a smaller area than that agreed to by the seller.

Id. at 749; see also Hood v. Legg, 128 S.E. 891, 895 (Ga. 1925) (noting that sale of business covenants should be upheld because, inter alia, the seller was compensated for the covenant, and the covenant does not restrict trade because the business will be carried on by the buyer).

On the other hand, a covenant ancillary to employment is "'enforceable only where it is strictly limited in time and territorial effect and is otherwise reasonable

---

[13] In Georgia, the term "blue pencil" is defined as "judicial editing of covenants which were not written in such a way that they are divisible by simply excising certain parts or words from them." White, 303 S.E.2d at 748 n.*.

11

considering the business interest of the employer sought to be protected and the effect on the employee.'" White, 303 S.E.2d at 748 (citation omitted). Georgia courts apply strict scrutiny, Swartz Investments, LLC, 556 S.E.2d at 463, and they cannot blue-pencil covenants, unenforceable in their entirety, to sever overreaching provisions. White, 303 S.E.2d at 748. Recognizing that employees often choose not to challenge illegal covenants in hopes of maintaining good relations with former employers, the Georgia Supreme Court refuses to reform even reasonable employment covenants in order to discourage employers from fashioning overly broad covenants that will remain unchallenged in most instances. See id. at 748-49 & n.**. In other words, if an otherwise valid contract contains one overly broad non-solicitation or non-competition covenant, the other non-solicitation or non-competition covenants in the same agreement are automatically rendered unenforceable. Ward v. Process Control Corp., 277 S.E.2d 671, 673 (Ga. 1981); Advance Technology Consultants, Inc. v. Roadtrac, LLC, 551 S.E.2d 735, 737 (Ga. Ct. App. 2001).[14]

Thus, the first step in determining the enforceability of a non-solicitation covenant is to classify it as ancillary to employment or to the sale of a business.

---

[14]As explained subsequently, Georgia courts treat separately covenants against the solicitation of employees.

12

White, 303 S.E.2d at 749. As the Georgia Supreme Court has recognized, this classification is not obvious with some agreements. When the buyer of a business argues that a covenant was given ancillary to the sale of the business, and the seller argues that it was given ancillary to his employment, Georgia law requires that we analyze the bargaining capacity of the covenantor to determine whether he is more like an owner of the business or an employee. Id. at 751; see also Swartz Invs., 556 S.E.2d at 369 (noting that employment agreements generally involve parties of unequal bargaining power). "If it appears that [the covenantor's] bargaining capacity was not significantly greater than that of a mere employee, then the covenant should be treated like a covenant ancillary to an employment contract." White, 303 S.E.2d at 751. Additionally, we can consider the existence of any independent consideration given for the covenant because employment itself is generally the only consideration given for an employment related agreement. Swartz Invs., 556 S.E.2d at 369.

In White, the Georgia Supreme Court addressed the validity of an agreement signed by a former senior vice-president of an advertising company when he sold his small minority interest in the business to his new employer. Through an employee stock plan, White had acquired 4.62% of the advertising company. He ranked fifth in size of holdings out of sixty-nine employees who owned stock. 303

13

S.E.2d at 747. When the advertising company was acquired by another company, White sold the shares to the buyer and, as required by the buyer as a condition of sale, executed a non-compete agreement. At that time, his stock was worth about $85,000. White was fired shortly after the acquisition. Id. at 748. The Georgia Supreme Court rejected the buyer's arguments that White's agreement was signed ancillary to the sale of the advertising company:

> It is clear that despite his ownership of a relatively small, interest in [the company] and his potential veto power over the merger, White had no control over overall management of [the advertising company], and in fact had so little bargaining clout within [the company] that he was unable to prevent his own termination. He was nothing more than an employee, albeit an important one, and as an employee White could reasonably have assumed that if he did not do as [the company] and [its buyer] wished he would be stigmatized as not being a team player, thereby jeopardizing his career prospects with [the company].

Id. at 750. In reaching this conclusion, the Georgia Supreme Court could rely on the fact that White exercised no control over the decision to pursue a merger and did not take part in merger negotiations, although he voted in favor of the merger. Id. at 747. Additionally, White had testified that he had been told that "he should sign the agreements because they were necessary to guarantee his job and secure broader career opportunities for him." Id. at 748.

14

In <u>Drumheller v. Drumheller Bag & Supply, Inc.</u>, 420 S.E.2d 331, 334-35 (Ga. Ct. App. 1992), the Georgia Court of Appeals held that non-competition agreements executed in a stock sale by the three employees of a closely held textile company could be treated as ancillary to the sale of a business. The three employees owned between five and 13.5 percent of the company's shares. <u>Id.</u> at 333 n.2. The stock sales agreement required the employees to sign the agreements. Additionally, they "executed employment contracts pursuant to the terms of the stock sales agreement, providing for their continued employment" with the buyer for three years. <u>Id.</u> at 333. In ruling that the agreements formed part of the consideration given for the stock deal, even though the employees became employed by the buyer, the Georgia Court of Appeals cited, among other things, the employees' representation by counsel during the sales negotiations, their awareness of the consequences of the sale, and the lack of evidence of unfair pressure to sell their stock from the buyer of the business and their future employer. <u>Id.</u> at 334-35.

As these cases demonstrate, the classification of an agreement as ancillary to employment or to the sale of a business depends on the particular factual circumstances of each case. <u>See</u> <u>generally</u> <u>Swartz Invs.</u>, 556 S.E.2d at 463-64 (discussing the factual inquiry required to classify an agreement). Here, MMC

15

argues that drawing all factual inferences in favor of MMC, the non-movant, we cannot conclude that Meathe's status at J&H was more akin to an employee, as in White, rather than to the owner of a business, as in Drumheller. On the one hand, the record shows that Meathe was not specifically referenced in the 1997 Agreement, whereas other individuals at J&H were. Meathe was not included in the list of individuals that could impute knowledge to J&H in the transaction. Further, Meathe was not a director of J&H, and the 1997 Agreement, not generic to all shareholders, distinguished directors. Finally, we know that the five-year solicitation term which began at the closing date had expired when Meathe took a job at P&C. Only the two-year term linked to Meathe's employment remains valid. As P&C and Meathe point out, the 1997 Agreement would no longer be in effect had Meathe not accepted employment at MMC.

On the other hand, we do not know whether Meathe had control over the decision to seek the merger between J&H and MMC. See White, 303 S.E.2d at 747. We do not know whether Meathe took part in the merger negotiations, voted in favor of a merger, or was represented by counsel. See id.; Drumheller, 420 S.E.2d at 334-35. We do not know whether Meathe signed the 1997 Agreement in order to guarantee his job, or whether the merger was conditioned on Meathe's signing it. See White, 303 S.E.2d at 748. Additionally, the pleadings do not

16

explicitly show the type of employment held by Meathe at J&H, other than that he was not one of the company's directors. MMC alleges in its Amended Answer that Meathe was a "senior executive" at J&H. R2-25 at 11 ¶ 7. Meathe represents that he does not have sufficient information to confirm or deny this allegation. R2-27 at 3 ¶ 7.

P&C and Meathe concede that "[t]here is no question that the 1997 Stock Purchase Agreement is a stock purchase agreement and not an employment agreement," Brief of Appellees and Cross-Appellants, Palmer & Cay, Inc., and James B. Meathe at 8, but they also argue that it should be given strict scrutiny as an employment agreement because only the two-year non-solicitation term linked to the termination of Meathe's employment is still in effect. Although Meathe cites no cases for this argument, the Georgia Supreme Court has noted in dicta that a non-competition period that starts with the termination of employment "is customary in cases of noncompetitive covenants ancillary to an employment contract." See Insurance Ctr., Inc. v. Hamilton, 129 S.E.2d 801, 805 (Ga. 1963). Nonetheless, we cannot grant judgment on the pleadings unless MMC "'can prove no set of facts'" which would allow it to prevail. Horsley, 304 F.3d at 1131 (citation omitted). Given Georgia's focus on the covenantor's bargaining power at the time of the sale, the link between the start of the non-solicitation period and

Meathe's termination of employment is alone insufficient to allow us to conclude, at the pleading stage, that the 1997 Agreement, entitled "Stock Purchase Agreement," is a contract ancillary to employment. Consequently, the district court erred in granting judgment on the pleadings in favor of P&C and Meathe.

B.     2002 Agreement

MMC argues that the 2002 Agreement cannot at this stage be deemed ancillary to employment because facts relating to Meathe's bargaining power are not known. Unlike the 1997 Agreement, however, the 2002 Agreement did not arise contemporaneously with Meathe's sale of his interest in a business. Meathe signed the 2002 Agreement in order to gain rights to exercise MMC stock options, not to sell MMC stock. Thus, the district court correctly concluded that the 2002 Agreement is ancillary to employment. See Redmond v. Royal Ford, Inc., 261 S.E.2d 585, 588 (Ga. 1979) (per curiam) (deeming ancillary to employment an agreement "not made by the seller in conjunction with the sale of a business," but "by the buyer in conjunction with the acquisition of an interest in a business").[15]

---

[15] Citing dicta in AGA, LLC v. Rubin, 533 S.E.2d 804 (Ga. Ct. App. 2000), Saxton v. Coastal Dialysis & Medical Clinic, Inc., 470 S.E.2d 252 (Ga. Ct. App. 1996), and a law review article, MMC argues that an employee's level of responsibility or management within a company determines the level of scrutiny to be applied to any non-competition or non-solicitation agreement he executes, and that we should not apply strict scrutiny to restrictive covenants binding a corporation's upper-level managers or shareholders. According to this argument, if we had sufficient facts to determine that Meathe exercised bargaining power with respect to the 2002 Agreement, we would apply lessened scrutiny even if it had no connection to the sale of a

An agreement ancillary to employment will be upheld only if it is not unreasonable, is founded on valuable consideration, is reasonably necessary to protect the employer's interests, and does not unduly prejudice the public interest. W.R. Grace & Co. v. Mouyal, 422 S.E.2d 529, 531 (Ga. 1992). Applying this standard, Georgia courts refuse to enforce employment non-competition agreements that prohibit the employee from accepting unsolicited business from former clients after leaving employment. Waldeck v. Curtis 1000, Inc., 583 S.E.2d 266, 268 (Ga. App. Ct. 2003) (citing Singer v. Habif, Arogeti & Wynne, P.C., 297 S.E.2d 473, 475 (Ga. 1982)).

In this case, the 2002 Agreement contains a provision that prevents Meathe from accepting unsolicited business from former clients of Marsh. Under Singer, 297 S.E.2d at 475 and Waldeck, 583 S.E.2d at 268, this provision is invalid under Georgia law. Since it cannot be blue-penciled, the 2002 Agreement is thus unenforceable in Georgia.

MMC argues that the district court erred in concluding that, given Meathe's potentially high bargaining capacity and senior position at Marsh, MMC's

business. Because Georgia law, as enunciated by the Georgia Supreme Court, still instructs us to apply strict scrutiny to agreements ancillary to employment, see White, 303 S.E.2d at 749; Redmond, 261 S.E.2d at 588, we decline to extend Georgia law to apply intermediate or lessened scrutiny to the 2002 Agreement.

attempts to conform the 2002 agreement to Georgia law by promising not to enforce certain provisions makes it enforceable under Georgia law. Although no case precedent in Georgia addresses employers' self-reformation of invalid restrictive covenants, the policies underlying Georgia's refusal to blue-pencil over-broad employment contracts apply equally to employers' attempts to do so on their own. As the district court notes, if employers were allowed to blue-pencil their agreements, they "could load up [non-competition agreements] with oppressively overreaching terms and intimidate all but the litigation-hardy employees, then post-hoc excise offending provisions to avoid requested judicial invalidation." Palmer & Cay, Inc. v. Marsh and McLennan Cos., No. 403CV094 at 11. This conclusion does not rest on the assumption that MMC originally drafted the agreement to oppress Meathe. Rather, Georgia's refusal to blue-pencil employment contracts applies regardless of an individual employer's motivations in fashioning a non-competition agreement. See White, 303 S.E.2d at 750 (declining to address whether employer "in fact took advantage of their dominant bargaining power to extract [the employee's] promises" when refusing to blue-pencil a restrictive covenant). Thus, MMC's attempt to excise the overly broad portions does not make the 2002 Agreement enforceable in Georgia.

C.    Proper Scope of the Declaratory Judgment and Injunction

On cross-appeal, Meathe and P&C argue that the district court erred in failing to consider whether to issue a declaratory judgment and enjoin enforcement of the 1997 and 2002 Agreements outside of Georgia. First, they contend that the Full Faith and Credit Clause applies to the district court's judgment and prohibits a court from curtailing the extraterritorial effect of its judgment. Second, they argue that our decision in Keener v. Convergys Corp., 342 F.3d 1264 (11th Cir. 2003), the case which the district court cited in limiting its declaratory judgment and injunction to Georgia, applies only to injunctions and does not govern the district court's declaratory judgment.[16] In response, MMC contends that the Full Faith and Credit clause does not require the district court to impose Georgia's public policy on other states, and that Keener applies here to forbid a declaratory judgment which has effect throughout the nation.[17]

---

[16] Meathe and P&C also argue that a recent Georgia Court of Appeals case, Hostetler v. Answerthink, Inc., 599 S.E.2d 271 (Ga. Ct. App. 2004), overrules the panel's decision in Keener. However, we are bound by the panel's decision in Keener unless and until it is overruled by intervening, on-point case law from our circuit sitting en banc, the Supreme Court, or, on matters of Georgia state law, the Georgia Supreme Court. See United States v. Chubbuck, 252 F.3d 1300, 1305 n.7 (11th Cir. 2001). Not only is Hostetler not a decision of the Georgia Supreme Court, Keener's discussion of the district court's injunction was based on the federal law governing injunctive relief, see Keener, 342 F.3d at 1269 (citing Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr., 97 F.3d 492, 496 (11th Cir. 1996); Newman v. Alabama, 683 F.2d 1312, 1319 (11th Cir. 1982)). As such, we are bound by the decision in Keener.

[17] On 11 May 2004, Meathe and P&C moved the district court to hold MMC in civil contempt for violating the district court's injunction. They alleged that MMC sought to enforce the 1997 and 2002 Agreements against Meathe in a pending action in Michigan state

21

court and that Meathe had been served with a copy of the Complaint and Summons at his office in Atlanta, Georgia, by an authorized process server acting under the laws of Georgia.

On appeal, MMC argues that Meathe and P&C contended in that motion that the district court's injunction was not limited to Georgia, a position inconsistent with the position they take on appeal. As such, MMC argues that we should apply judicial estoppel to dismiss their cross-appeal. In response, P&C and Meathe argue that they have not taken inconsistent positions under oath in a prior proceeding, and that judicial estoppel does not apply.

Under judicial estoppel, an equitable doctrine, a party is prevented from "'asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'" Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285 (11th Cir. 2002) (citation omitted). We consider two main factors in determining whether to apply the doctrine. First, the allegedly inconsistent positions must have been taken "'under oath in a prior proceeding,'" and second, they must have been "'calculated to make a mockery of the judicial system.'" Id. (citation omitted). These factors are not exhaustive, however, and we take into account all of the circumstances of each case in making our determination. Id. at 1286. Other pertinent factors include whether the present position is "'clearly inconsistent' with the earlier position" and whether the party successfully persuaded a court to accept the earlier position, "so that judicial acceptance of the inconsistent position in a later proceeding creates the perception that either court was misled." Id. at 1285 (citation omitted).

In this case, we decline to exercise our discretion to apply judicial estoppel to Meathe and P&C's cross-appeal. First, we believe that their positions were not clearly inconsistent. Meathe and P&C concluded the background section of their supporting brief for their motion by arguing that "[s]ervice of the Summons on Meathe in Georgia by Georgia judicial officers is a clear violation of the November 11 Order." PLAINTIFFS' BRIEF IN SUPPORT OF ITS MOTION TO SHOW CAUSE at 2. Although, as MMC explains on appeal, Meathe and P&C argue in one paragraph in the brief that the order could be interpreted to enjoin conduct with a "nexus" to Georgia despite its extraterritorial effect, and, in that paragraph, they contend that "MMC was not warranted in assuming that the injunction allowed it to file suits in other states. . . especially . . . given the long-standing power of courts to enjoin conduct outside the borders of its jurisdiction," id. at 4, they clarified in their reply brief that their motion was "based on Defendant's service of process on Meathe **in Georgia** by the use of an official appointed by the Fulton County Superior Court to serve process in Fulton County, Georgia; pursuant to Georgia law," PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO SHOW CAUSE at 1. As such, we believe that the thrust of Meathe and P&C's argument concerned the service of process on Meathe in Georgia. This position is not inconsistent with their position on cross appeal, that the district court issued an injunction that was limited to Georgia. Moreover, if Meathe and P&C did attempt to convince the district court that its injunction did not extend to other states, they did not succeed. In ruling on the motion, the district court clarified that it intended "to restrain MMC from bringing any further court actions in Georgia to enforce its [non-competition agreements] against Meathe" and that it did not intend "to restrain it from enforcement actions elsewhere." Palmer & Cay, Inc. v. Marsh & McLennan Cos., No. 403CV094 at 2 (S.D. Ga. July 7, 2004) (order denying contempt motion).

22

Although we review de novo a district court's legal conclusions underlying a decision to grant injunctive relief, Major League Baseball v. Crist, 331 F.3d 1177, 1183 (11th Cir. 2003), we review the scope of the district court's injunction for abuse of discretion, Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr., 97 F.3d 492, 496 (11th Cir. 1996). As we explained previously, our review of the district court's grant of judgment on the pleadings is de novo. See Horsley, 304 F.3d at 1131.

In Keener, we held that a district court abused its discretion by enjoining the enforcement of an agreement nationwide, when the agreement, invalid under Georgia law and public policy, had selected another state's law. See 342 F.3d at 1270. The plaintiff, Keener, had been employed by an Ohio corporation. He worked in Illinois and Ohio, and he signed an agreement which designated Ohio law as its governing law. Keener then accepted a job at a competitor located in Georgia. He brought an action in federal district court in Georgia and sought declaratory and injunctive relief as to the validity and enforceability of the agreement. See Keener v. Convergys Corp., 312 F.3d 1236, 1238-39 (11th Cir. 2002).

On appeal, we answered two relevant questions: first, whether the agreement was unenforceable under Georgia law, and, second, whether the district court abused its discretion in permanently enjoining the enforcement of the agreement worldwide. Keener, 342 F.3d at 1267. In answering the first question, we applied the law as certified by the Supreme Court of Georgia, and we held that the district court had properly granted summary judgment declaring the agreement unenforceable under Georgia law. Id. at 1268-69. In answering the second, we held that the district court should have limited the injunction to Georgia. Id. at 1270. Keener thus contained two holdings. The first addressed the propriety of summary judgment. The second concerned the scope of the injunction.

In Keener, we did not specifically address the geographic scope of the district court's declaratory judgment. As Meathe and P&C point out, however, we noted that "Georgia cannot in effect apply its public policy decisions nationwide–the public policy of Georgia is not that everywhere," id. at 1269, and we stated that "[t]he agreement is unenforceable under Georgia law, in Georgia," id. at 1270. Taken out of context, these quotes seem to indicate that Keener applies to declaratory judgments as well. Viewed in context, however, they do not. They refer to Georgia's power to enforce nationwide, by way of a nationwide injunction, its public policy interests. Cf. Klay v. United Healthgroup, Inc., 376

24

F.3d 1092, 1103 n.15 (11th Cir. 2004) (considering quote from prior case, in light of, inter alia, the factual context of the case and the precedents cited). Keener controls the injunction issued by the district court, but not its declaratory judgment. As such, the district court did not err in citing Keener to limit the scope of the injunctive relief to Georgia.

We next determine whether the district court erred in restricting the scope of its declaratory judgment to Georgia. Few cases address the geographical scope of a judgment from the perspective of the rendering forum. In most instances, courts address the reach of a judgment when asked to recognize or enforce a judgment issued by another court. They apply the doctrines of claim and issue preclusion to determine indirectly the scope of the prior judgment. See, e.g., Baker v. General Motors Corp., 522 U.S. 222, 233, 118 S. Ct. 657, 663-64 (1998).

Although these cases address the problem from the perspective of the enforcing court, they stand for several general principles which inform our disposition of P&C and Meathe's cross-appeal. Under the Full Faith and Credit Clause of the United States Constitution[18] and its implementing statute, 28 U.S.C.

_____

[18]The Full Faith and Credit Clause provides:
> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

25

§ 1738,[19] which apply to judgments rendered by state courts,

> [a] final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land. For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force.

Id., 118 S. Ct. at 663-664 (footnote omitted). This rule applies even if the rendering state's judgment is based on public policy offensive to the enforcing state. Id., 118 S. Ct. at 664. Conversely, since enforcing states ultimately decide the scope of its judgment, a rendering state can "determine the extraterritorial effect of its judgement . . . only . . . indirectly by prescribing the effect of its judgments within the State." Thomas v. Washington Gas Light Co., 448 U.S. 261, 270, 100 S. Ct. 2647, 2655 (1980). "To vest the power of determining the extraterritorial effect of a State's own . . . judgments in the State itself risks the very kind of parochial entrenchment on the interests of other States that it was the

---

U.S. CONST. art. IV, § 1.

[19]Title 28 U.S.C. § 1738 provides in relevant part:
The records and judicial proceedings of any court of any . . . State, Territory or Possession . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

purpose of the Full Faith and Credit Clause and other provisions of Art. IV of the Constitution to prevent." Id. at 272, 100 S. Ct. at 2656.

In contrast, federal common law determines the scope of judgments rendered by federal courts sitting in diversity.[20] Under federal common law, an enforcing court should apply the law of the state courts in the state where the rendering federal court sits, unless the state's law conflicts with federal interests. Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 509, 121 S. Ct. 1021, 1028 (2000). This rule, according to the Supreme Court in Semtek International Inc., achieves the aims of Erie by discouraging forum shopping and encouraging a uniform administration of law. Id. at 508-09, 121 S. Ct. at 1028.

In determining the applicable federal common law in this case, we conclude that the goals underlying Semtek apply. Georgia does not attempt to limit its declaratory judgments in cases involving non-competition agreements. See Hostetler v. Answerthink, 599 S.E.2d 271, 275 (Ga. Ct. App. 2004) (noting that under Georgia law of claim and issue preclusion, a final declaratory judgment with

---

[20] Contrary to both parties' arguments, neither the Full Faith and Credit Clause nor its implementing statute applies to judgments issued by federal courts. "By their terms they govern the effects to be given only to state-court judgments (and, in the case of the statute, to judgments by courts of territories and possessions). And no other federal textual provision, neither of the Constitution nor of any statute, addresses the claim-preclusive effect of a judgment in a federal diversity action." Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 506-07, 121 S. Ct. 1021, 1027(2000).

27

respect to a non-competition agreement precludes subsequent claims or issues from being relitigated in other states); cf. Gunby v. Simon, 594 S.E.2d 342, 343 (Ga. 2004) (addressing Georgia law of claim preclusion generally); Shields v. Bellsouth Adver. & Publ'g Corp., 545 S.E.2d 898, 900-01 (Ga. 2001) (addressing Georgia law of issue preclusion generally). A federal district court sitting in Georgia and applying Georgia law should not do so either. This result comports with the aims of Erie and the principles of the Full Faith and Credit Clause. As such, we vacate the district court's declaratory judgment to the extent it attempted to limit relief to Georgia.

### III. CONCLUSION

This appeal concerns two employee and client non-solicitation agreements entered into between Meathe and MMC. The district court determined that these agreements were unenforceable in Georgia and granted judgment on the pleadings in favor of Meathe and P&C, his current employer. First, because material issues of facts remain regarding Meathe's bargaining power in the merger negotiations between J&H and MMC, we conclude that the district court erred in granting judgment on the pleadings in favor of P&C and Meathe on their claim that the 1997 Agreement is unenforceable under Georgia public policy. Second, we determine that the district court did not err in ruling that the 2002 Agreement is

28

unenforceable under Georgia law.  Finally, we decide that the district court correctly applied <u>Keener</u> to limit its injunction to Georgia but erred in limiting its declaratory relief to Georgia.  Accordingly, we **AFFIRM** in part, **VACATE** in part, and **REMAND** for proceedings consistent with this opinion.