[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 24, 2010
JOHN LEY
CLERK

No. 09-15813
Non-Argument Calendar

_____

_____

D. C. Docket No. 09-02999-CV-TWT-1

MICHAEL A. MOHR,
D. JACK SAWYER, JR.,

Plaintiffs-Counter-
Defendants-Appellees,

TODD TAUTFEST,

Plaintiff-Counter-
Defendant,

versus

BANK OF NEW YORK MELLON CORPORATION,

Defendant-Counter-
Claimant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 24, 2010)

Before WILSON, PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

The Bank of New York Mellon Corporation appeals a preliminary injunction issued in favor of Michael Mohr and Jack Sawyer Jr. regarding the enforcement of noncompetition and nonsolicitation covenants executed by Mohr and Sawyer during the sale of their investment management business to Mellon Corporation. The district court enjoined enforcement of the covenants. We vacate the preliminary injunction and remand for further proceedings.

## I. BACKGROUND

In 2002, representatives of Mellon Financial Corporation approached Mohr, Sawyer, and a third shareholder to purchase their investment management business, The Arden Group, Inc. On June 30, 2003, the Boston Company, Inc., a wholly-owned subsidiary of Mellon Corporation, purchased the assets of The Arden Group. As part of the transaction, Mohr and Sawyer executed an Asset Purchase Agreement and separate employment agreements.

The Purchase Agreement and employment agreements were interdependent. The documents shared defined terms, contained cross-references, and the documents, as stated in the employment agreements, together "constitute[d] the entire agreement of the parties."

2

The Purchase Agreement provided that Mellon Corporation purchased "substantially all of the assets of" The Arden Group, "including, without limitation, the conversion of the Customers of [The Arden Group] to customer contracts with Purchaser or an Affiliate of Purchaser" and the "goodwill associated with [The Arden Group] and [its] future prospects." In exchange, Mohr and Sawyer received stock in the Mellon Corporation and millions of dollars to be paid after the transfer of client accounts and on the third and fifth anniversary dates based on the trading value and annual revenue growth of Mellon Corporation. The Purchase Agreement stated that the sale was conditioned on Mohr and Sawyer executing employment agreements and an agreement not to compete with the Mellon Corporation.

A noncompetition covenant provided that Mohr and Sawyer would not compete with the Mellon Corporation with any similar investment business within 50 miles of any city or town listed on a schedule to the Agreement from the later of five years from the date of closing or twelve months after termination:

5.10   Noncompetition

(a)   In view of the fact that any activity of [Mohr and Sawyer] in violation of the terms of this [provision] would deprive Purchaser of the benefits of its bargain . . . and to preserve the goodwill associated with [The Arden Group], each Selling Party . . . will not, without the express written consent of Purchaser, directly or indirectly, anywhere within fifty (50) miles of any city or town listed

3

on Schedule 9 (collectively, the "Restricted Territory"), engage, directly or indirectly, in any capacity (whether as owner, part-owner, shareholder, member, partner, director, officer, trustee, employee, agent or consultant, or in any other capacity), in any business, organization or person other than Purchaser (or any Affiliate of Purchaser or any Person deriving title from Purchaser to the assets of the Company and the accompanying goodwill purchased hereunder (any such person, a "Successor")) whose business, activities, products or services are similar to providing investment advisory or investment management services, or any Fiduciary Services, to individual or institutional customers.  Notwithstanding the foregoing, subject to the terms of Section 5.08(b), [Mohr and Sawyer] shall be permitted to continue to provide Fiduciary Services with respect to any Existing Fiduciary Appointments; provided, however, in the event, prior to the end of the Noncompetition Period, (x) the employment of [Mohr and Sawyer] providing Fiduciary Services with respect to any Existing Fiduciary Appointments shall terminate, (y) [Mohr and Sawyer] shall continue to provide Fiduciary Services with respect to any Existing Fiduciary Appointments, and (z) the agreement for Purchaser (or any Successor) to provide investment management services with respect to any such Existing Fiduciary Appointments is terminated (other than at the direction of Purchaser or any Successor), then [Mohr and Sawyer] shall promptly pay to Purchaser . . . an amount equal to the Allocated Value of the Customer accounts associated with such Existing Fiduciary Appointments.

(b)     For purposes of this Agreement, the "Noncompetition Period" shall mean the period commencing on the Closing Date and terminating:

(i)     With respect to [The Arden Group], five (5) years from the Closing Date; and

(ii)     With respect to [Mohr and Sawyer], the later of (y) the fifth (5th) anniversary of the Closing Date or (z) twelve (12) months after the termination of such Continued Employee's employment with Purchaser or an Affiliate of Purchaser (except as otherwise provided in

4

Section 5.10(f) below [, which relates to "termination for good reason" by Mohr or Sawyer or "termination without cause" by Mellon Corporation]).

Mohr and Sawyer executed identical employment agreements. Each Employment Agreement was effective for five years from the "Effective Date" of the sale, after which Mohr and Sawyer would have the rights of "an employee at will." The Employment Agreement stated that the purchase of The Arden Group was "conditioned" on "the agreement of" Mohr and Sawyer "to execute an employment agreement with the Purchaser or an affiliate . . . containing certain restrictive covenants ancillary to the sale of the business."

The Employment Agreement contained three restrictive covenants: not to disclose confidential information, not to solicit clients, and not to compete with Mellon Corporation. The Employment Agreement stated that the nonsolicitation covenant was binding during the "Restricted Period," which was defined as "the period commencing on of the Effective Date and terminating on the later of (y) the fifth (5th) anniversary of the Effective Date and (z) eighteen (18) months after the termination of Employee's employment with the Company, regardless of reason for termination of employment." The nonsolicitation covenant provided that Mohr and Sawyer would not solicit individuals who were either former clients of The Arden Group and Mellon Corporation or prospective clients Mohr and Sawyer had

5

contacted in the two years before they were fired or resigned from Mellon

Corporation:

> 3.05 Solicitation of Clients. Employee recognizes and acknowledges that it is essential for the proper protection of Confidential Information that Employee be restrained from soliciting business of or doing business with Customers (as defined below) for any business purpose, other than Mellon's own business purpose. During the Restricted Period, Employee shall not, in any capacity, directly or indirectly, (i) solicit the Asset Management Services (as defined below) business of any Customer for any other person or entity, (ii) divert, entice, or otherwise take away from the Company the Asset Management Services business or patronage of any Customer, or attempt to do so, or (iii) solicit or induce any Customer to terminate or reduce its business relationship with the Company with respect to Asset Management Services. For purposes of this Agreement, "Asset Management Services" shall mean providing investment advisory or investment management services, or any Fiduciary Services (as such term is defined in the Purchase Agreement), to individual or institutional customers. For purposes of this Agreement, "Customer" shall mean any person or entity (a) who (1) received Asset Management Services from the Seller at any time during the two (2) year period immediately preceding the Effective Date and (2) received Asset Management Services from the Seller, the Company or an affiliate of the Company at any time during the two (2) year period immediately preceding the date of termination of Employee's employment with the Company, or (b) who Employee contacted, directly or indirectly, in whole or in part, on behalf of Company to provide Asset Management Services within the two (2) year period immediately preceding the date of termination of Employee's employment with the Company.

The Employment Agreement referenced the noncompetition covenant in the

Purchase Agreement and stated that the restrictive covenant was part of the

consideration for the purchase of The Arden Group:

Employee agrees to be bound by the noncompetition provisions set forth in Section 5.10 of the Purchase Agreement. Employee acknowledges that the time, scope, geographic area and other provisions of Section 5.10 of the Purchase Agreement have been specifically negotiated by the parties and agrees that (a) all such provisions are reasonable under the circumstances of the transactions contemplated by this Agreement and the Purchase Agreement, (b) are given as an integral and essential part of this Agreement and the Purchase Agreement, and (c) but for the agreement of Employee in Section 5.10 of the Purchase Agreement, the Purchaser would not have agreed to the acquisition of the assets of the Seller and [the Mellon Corporation] would not have entered into this Agreement.

The final provision of the Employment Agreement stated that the covenants made by Mohr and Sawyer continued even after the Employment Agreement terminated:

5.10 Survival. Without limiting any other provision of this Agreement, Sections . . . 3.01 [covenant not to disclose], . . . 3.06 [covenant not to solicit], . . . and 3.10 [covenant not to compete] shall survive termination of this Agreement until expiration of the applicable period to which such provisions relate.

On July 1, 2007, Mellon Corporation merged with Bank of New York to form Bank of New York Mellon Corporation. Mohr and Sawyer became employees of subsidiaries of BNY Mellon. On October 26, 2009, Mohr and Sawyer resigned from BNY Mellon and accepted employment with a competitor, Wilmington Trust Company.

On October 28, 2009, the General Counsel of Mellon Corporation sent a letter to Mohr and Sawyer about their obligations under the restrictive covenants. That same day, Mohr and Sawyer filed a complaint that requested a declaratory

7

judgment that the restrictive covenants were "invalid and unenforceable . . . under Georgia law" and an injunction to prevent Mellon Corporation from enforcing the restrictive covenants. Mellon Corporation filed a counterclaim and requested both a declaratory judgment that the restrictive covenants were enforceable and a temporary restraining order to prevent Mohr and Sawyer from violating the restrictive covenants.

At a hearing on the motions to enjoin, Mohr and Sawyer argued that the restrictive covenants "ought to be viewed as agreements ancillary to an employment arrangement as opposed to the sale of [sic] business. . . . because they [were] tied to the termination of employment" and were unenforceable under the laws of Georgia. In the alternative, Mohr and Sawyer argued that if the agreements were "construed in the context of a sale of [sic] business," they were "nevertheless still overbroad" and should be "dramatically modif[ied]." Mellon Corporation responded that Mohr and Sawyer executed the noncompetition and nonsolicitation covenants ancillary to the sale of their business, the restrictive covenants were enforceable, and the restrictive covenants could be "blue-penciled" to the extent the district court concluded that they were overbroad.

The district court granted a preliminary injunction to Mohr and Sawyer. The court ruled that the restrictive covenants became ancillary to employment after

8

Mohr and Sawyer became employees at will:

> I think that the Georgia courts would apply the strict scrutiny standard to both the non-compete agreement and the no-solicitation agreement after Mr. Mohr and Mr. Sawyer became employees at will. I think before that strong argument could be made that these restrictions were ancillary to the sale of a business. But once the restrictions became tied to termination of employment, then I think that characteristic no longer exists and it is strictly an agreement ancillary to employment and not ancillary to the sale of the business.

The district court later entered a preliminary injunction that enjoined Mellon Corporation "from proceeding with or prosecuting any legal action against" Mohr and Sawyer "based on, relating to, or arising out of the nonsolicitation and noncompetition covenants contained in the Asset Purchase Agreement and the Employment Agreements." The district court ruled that the "noncompetition and nonsolicitation covenants contained in the Asset Purchase Agreement and their Employment Agreements are likely ancillary to employment relationships and, therefore, subject to strict scrutiny." The district court explained that its decision was based on "the Plaintiffs' status as employees at will, the lapse of time between the asset sale and Plaintiffs' departure, the attendant changes in Plaintiffs' employment with their employers, and the terms of the relevant agreements," in particular "the fact that the noncompetition and nonsolicitation covenants are tied to the termination of Plaintiffs' at-will employment." In a footnote, the district court stated that even if the restrictive covenants were executed ancillary to the sale

9

of a business, they were "overly broad as to scope, territory, and time," and the court would "'blue pencil' [the] covenants to narrow their application."

## II. STANDARDS OF REVIEW

After issuance of a preliminary injunction, we review <u>de novo</u> the legal conclusions of the district court and related findings of fact for clear error. <u>Horton v. City of St. Augustine, Fla.</u>, 272 F.3d 1318, 1326 (11th Cir. 2001). We review the balancing of factors for a preliminary injunction for a clear abuse of discretion. <u>Id.</u>

## III. DISCUSSION

Mellon Corporation argues that the district court granted the preliminary injunction based on an error of law. A district court may grant a preliminary injunction when a movant establishes that he has a "substantial likelihood of success on the merits," the moving party would suffer an "irreparable injury . . . unless the injunction issue[d]," the injury inflicted outweighs any damage to the opposing party, and the injunction would "not disserve the public interest." <u>Horton</u>, 272 F.3d at 1326. Mellon Corporation argues that the district court applied an incorrect standard to determine whether the noncompetition and nonsolicitation covenants were enforceable. Mellon Corporation argues that Mohr and Sawyer executed the restrictive covenants ancillary to the sale of their business

and the district court erred by concluding that the restrictive covenants became ancillary to employment when Mohr and Sawyer later became at will employees.

Under Georgia law, which the parties agree applies, restrictive covenants are subject to different levels of scrutiny based on the circumstances that led to their execution. White v. Fletcher/Mayo/Assocs., Inc., 251 Ga. 203, 204–07, 303 S.E.2d 746, 748–50 (1983). When restrictive covenants are executed incident to the transfer of business ownership and continued employment, the restrictive covenants are treated as executed either ancillary to the sale of a business, which receives a low level of scrutiny, or ancillary to employment, which receives strict scrutiny. See id., 251 Ga. at 205–07, 303 S.E.2d at 749–50; Redmond v. Royal Ford, Inc., 244 Ga. 711, 713, 261 S.E.2d 585, 587 (1979). To determine the appropriate category, Georgia courts focus on two factors: the relative bargaining power of the parties and the consideration for the restrictive covenant. Palmer & Cay, Inc. v. Marsh & McLellan Cos., 404 F.3d 1297, 1304 (11th Cir. 2005); Swartz Invs., LLC v. Vion Pharm., Inc., 252 Ga. App. 365, 369, 556 S.E.2d 460, 463 (Ct. App. 2001); Russell Daniel Irrigation Co. v. Coram, 237 Ga. App. 758, 759, 516 S.E.2d 804, 805–06 (Ct. App. 1999).

Georgia courts have ruled consistently that a restrictive convenant executed simultaneously with the sale of the covenantor's business is made ancillary to the

11

sale of a business.  Dalrymple v. Hagood, 246 Ga. 235, 235–36, 271 S.E.2d 149, 150 (1980); Jenkins v. Jenkins Irrigation, Inc., 244 Ga. 95, 95–99, 259 S.E.2d 47, 48–50 (1979); Insurance Ctr., Inc. v. Hamilton, 218 Ga. 597, 601–02, 129 S.E.2d 801, 804–05 (1963); Hood v. Legg, 160 Ga. 620, 128 S.E. 891 (1925); Drumheller v. Drumheller Bag & Supply, Inc., 204 Ga. App. 623, 624–27, 420 S.E.2d 331, 332–35 (Ct. App. 1992).  In these transactions, the covenantor bargained for and received a part of the purchase price as consideration for the restrictive covenant. The covenantee, on the other hand, paid for and is entitled to enforce the restrictive covenant to protect the goodwill it purchased.

> When one is selling a business or purchasing partnership interests, more weighty consideration is being offered in exchange for the non-compete covenant.  The business seller is receiving substantial consideration for the business he has built up, the value of which would be significantly diminished to the buyer if he were allowed to compete in the same market.

Russell Daniel Irrigation, 237 Ga. App. at 759, 516 S.E.2d at 805; see, e.g., White, 251 Ga. at 206, 303 S.E.2d at 749 (discussing its decision in Jenkins Irrigation).

The Georgia Court of Appeals in Drumheller Bag & Supply, 240 Ga. App. 623, 420 S.E.2d 331, explained what circumstances dictate that a restrictive covenant will be classified as ancillary to the sale of a business.  In Drumheller, the Drumhellers sold their stock in Drumheller Bag to DBS Acquisition Company for one million dollars and a share of future annual net earnings.  Id. at 623–24, 420

12

S.E.2d at 332–33.  The Drumhellers also executed agreements to continue as employees for three years according to a term of the stock sale agreement.  Id. at 624, 420 S.E.2d at 333.  The employment agreements contained a covenant in which the Drumhellers agreed not to compete with DBS for five years or 18 months after their termination.  Id. at 624–25, 420 S.E.2d at 333.  About one month after the employment contracts expired, the Drumhellers were terminated and they sought a declaration that the noncompetition covenant was void and unenforceable.  Id. at 623, 625, 420 S.E.2d at 332, 333–34.  The Georgia court ruled that the Drumhellers executed the restrictive covenants ancillary to the sale of their business because the employment contracts were part of the consideration for the stock sale and the Drumhellers had equal negotiating power as DBS based on the Drumhellers' representation by counsel, their opportunity to evaluate the terms of the stock sale, and the benefits derived from the sale of their business.  Id. at 626–27, 420 S.E.2d at 334–35.

The transaction between Mohr, Sawyer, and Mellon Corporation is materially indistinguishable from the transaction in Drumheller.  The Purchase Agreement and Employment Agreement were part of a unitary contractual scheme in which Mellon Corporation sought to purchase both the client lists owned by The Arden Group and its goodwill, that is, the client relationships that Mohr and

13

Sawyer had already cultivated and were expected to develop in the future. See

Insurance Ctr., 218 Ga. at 602, 129 S.E.2d at 805 (holding that a restrictive

covenant was ancillary to the sale of a business when the purchase of the insurance

company and continued employment of the business owner was intended to

perpetuate and guarantee future sales). The Purchase Agreement provided that

Mohr and Sawyer would continue as employees of and would not compete with

Mellon Corporation. The Employment Agreement cross-referenced the covenant

not to compete in the Purchase Agreement, contained additional restrictive

covenants, and provided that those covenants were part of the consideration for the

transaction. The record establishes that, like the Drumhellers, Mohr and Sawyer

had bargaining power equal to that of Mellon Corporation. Mohr and Sawyer were

represented by counsel during the negotiations, they acknowledged in the

agreements that they were apprised of and found reasonable the restrictive

covenants, and they were compensated for the sale of their company and their

willingness to abide by the restrictive covenants.

The district court erred when it concluded that Mohr and Sawyer's later

employment status affected the classification of the restrictive covenants. A

restrictive covenant is classified according to the bargaining power of the

covenantor "at the time he negotiated the transaction." Russell Daniel Irrigation,

14

237 Ga. App. at 760, 516 S.E.2d at 806. The district court acknowledged that the restrictive covenants were made ancillary to the sale of a business when Mohr and Sawyer executed the agreements.

Mohr and Sawyer argue that the restrictive covenants were executed ancillary to their employment based on the decisions of the Georgia Court of Appeals in Arnall Insurance Agency Inc. v, Arnall, 196 Ga. App. 414, 396 S.E.2d 257 (Ct. App. 1990), and Watkins v. Avnet, Inc., 122 Ga. App. 474, 177 S.E.2d 582 (Ct. App. 1970), but we disagree. In Arnall and Watkins, the covenantors executed separate employment and sales agreements with independent restrictive covenants, such that "each covenant st[ood] on its own." 196 Ga. App. at 419, 396 S.E.2d at 261; 122 Ga. App. at 475–77, 177 S.E.2d at 583–84. In contrast with Arnall and Watkins, the purchase and employment agreements executed by Mohr and Sawyer were interdependent.

Although the noncompetition and nonsolicitation covenants were executed ancillary to the sale of a business, that legal conclusion does not end the matter: even when made ancillary to the sale of a business, a restrictive covenant must be reasonable. To determine its reasonableness, a restrictive covenant "must be measured on the basis of whether the restricted activity protects the purchaser's legitimate business interest, i.e., the value of the business and its good will."

15

Drumheller, 204 Ga. App. at 627, 420 S.E.2d at 335. If a restrictive covenant is overbroad, indefinite or vague, a reviewing court may "blue pencil" any objectionable portions to conform to Georgia law. White, 251 Ga. at 206, 303 S.E.2d at 749; Drumheller, 204 Ga. App. at 627, 420 S.E.2d at 335.

Although the district court stated that it would blue pencil the restrictive covenants, it did not do so. As Mellon Corporation concedes, that task must be performed, if at all, first by the district court. The district court must determine whether and to what extent to blue pencil the restrictive covenants to protect the business interests of the Mellon Corporation.

We **VACATE** the preliminary injunction issued in favor of Mohr and Sawyer, and we **REMAND** for further proceedings.

**VACATED AND REMANDED**.